This is a medical malpractice case. The sole issue is whether the trial court erred by granting the defendant's motion for directed verdict because the plaintiff failed to make a prima facie case. We affirm.
On the evening of Friday, March 9, 1979, Vernon Moses, the plaintiff/appellant, sustained a dislocation and a chipped bone in his right hand from an exploding tire where he worked. On that date, the appellant was treated in the emergency room of The University Medical Center by Dr. Crawford, the physician on duty. Dr. Crawford ordered and viewed the X-rays but failed to diagnose either the dislocation or the fracture. These X-rays were taken by Sandra Hoots, a technician, and consisted of three views, a P-A view, a lateral view, and an oblique view. The appellant was discharged from the emergency room that same night.
The next day, Saturday, March 10, Dr. William Gaba, a radiologist on the medical staff of the University Medical Center, viewed the X-rays ordered by Dr. Crawford. Dr. Gaba also failed to diagnose the dislocation and fracture. The following Monday, March 12, the appellant was seen by Dr. Odum, in Dr. Odum's office. Dr. Odum also failed to diagnose the dislocation and fracture and treated the appellant for an infection and for soft tissue injury to the hand. Dr. Odum and Dr. DeJong saw the appellant in their offices on the following Tuesday and Wednesday, March 13 and 14, but still failed to diagnose the dislocation and fracture.
On March 22, the appellant returned to Dr. Odum's office. He had continued swelling and made complaints of pain and was seen by Dr. Poteet, who ordered additional X-rays. Dr. Poteet diagnosed the dislocation, and referred appellant to Dr. Hordurski, an orthopedic surgeon, who concurred in the diagnosis of dislocation at the base of the second and third metacarpals and a "chip" fracture at the base of one metacarpal. After continuing under the care of Dr. Hordurski for several months, the appellant was referred by his attorney to Dr. Hillyer, an orthopedist with advanced training in hand injuries, who also concurred in the diagnosis of a dislocation and fracture.
At trial the appellant offered expert testimony from Dr. Crawford, Dr. Hillyer, Dr. Gaba, Dr. Hordurski, and offered medical texts. Dr. Crawford testified that the appellant's injury was of a very rare nature and that he had never seen one like it before nor since. It "is a very difficult injury to see. I would think that any specialist with any amount of experience or training could have easily missed that one."
Dr. Hillyer, to whom appellant had been referred by his attorney, testified that appellant's injury "is not sort of rare, it is very rare" and that as of 1975, only ten cases of this kind of injury of the second and third metacarpals had ever been reported in medical literature worldwide. Dr. Hillyer testified that, in retrospect, the March 9 X-rays show a "very subtle" abnormality or misalignment, but that seeing the X-rays without knowing the diagnosis, the very subtle changes on the March 9 X-rays "could be very easily overlooked . . . by anyone, by me, by a radiologist, emergency room physician or another orthopedist." He stated that the fact that an injury is rare can make diagnosis more difficult.
Dr. Hordurski testified that the injury sustained by the appellant was an extremely rare injury; only eleven are documented in medical literature worldwide and that he had treated only one such injury previously. Commenting on the March 9 X-rays, Dr. Hordurski testified, "I would hope that I would see it [the injury], but I may not," and he said that an experienced radiologist might or might not have recognized the abnormality shown on the March 9 X-ray, stating, "he could miss this one."
Dr. Hordurski further testified that he would expect a general practitioner to miss *Page 60 
the injury shown on the March 9 X-rays "over half the time." He described the abnormality that he detected in the March 9 X-rays as "a little bit of discrepancy between the third and fourth metacarpals, but nothing glaring." He also stated that in the March 9 X-rays, the bone was out of socket about 3/16ths of an inch and the fracture was an approximately 3/8ths inch chip. Although X-rays taken March 9 and March 22 were similar, Dr. Hordurski found a "tremendous" difference in the degree of suspicion presented by the case from March 9 to March 22. On March 9 and 10, the appellant's symptoms of swelling and pain were consistent with a mere bruise to a blood vessel. The fact that the appellant's swelling and pain continued through March 22 aroused considerable suspicion and provided a significant aid in diagnosis that was not available earlier.
When Dr. Hillyer, who we have previously indicated was the doctor who treated plaintiff/appellant after plaintiff/appellant was referred to him by an attorney, first saw the plaintiff in January, 1980, he testified that the hand was no longer swollen and that he could feel the abnormality, so that he was able to diagnose the injury before seeing X-rays, but Dr. Hillyer testified that in reading X-rays the treating physician has a "big advantage" over the radiologist, because the treating physician has examined the patient and has access to the patient's history. Dr. Hillyer likewise testified that the interpretation of X-rays is not an exact science and competent physicians can disagree over what an X-ray shows; it is solely a matter of judgment. On cross-examination, Dr. Hillyer responded that it was understandable that a good doctor being very careful might miss the plaintiff's injury on the March 9 X-rays and that it was not malpractice to fail to detect the subtle abnormalities shown in the March 9 X-rays.
Dr. Gaba testified that plaintiff/appellant's injury was "quite rare" and that the plaintiff/appellant's injury was the only one of its sort that he had ever seen. He testified that in retrospect, he could detect an area of suspicion on the March 9 X-rays, even though he did not detect this area of suspicion when he viewed the X-rays on March 10. The evidence indicated that on March 10, when Dr. Gaba viewed the X-rays made the previous day, the plaintiff/appellant had already been discharged and no medical history was available.
The plaintiff/appellant's initial and amended complaints alleged malpractice by the University Medical Center, Dr. William Gaba, Dr. Shepard Odum, Dr. Peter DeJong, and Sandra Hoots. Prior to the trial, Dr. DeJong and Ms. Hoots were voluntarily dismissed by appellant. Dr. Odum and the University Medical Center were voluntarily dismissed by appellant during the course of the appellant's case at trial.
Dr. Gaba, the only remaining defendant, moved for a directed verdict at the close of the plaintiff/appellant's case. The motion for directed verdict was based on the appellant's failure to establish a prima facie case, because no expert medical testimony was offered indicating that Dr. Gaba's misdiagnosis constituted negligence. The motion for directed verdict was granted, and this appeal followed.
The plaintiff/appellant contends that the trial court erred in granting the defendant's motion for a directed verdict because there was a scintilla of evidence which tended to show that Dr. Gaba breached his duty to exercise reasonable care, skill, and diligence in administering treatment in this case. Counsel for Dr. Gaba asserts in brief that:
 "We acknowledge that Dr. Gaba failed to discover a `very rare' hand injury that was subtly evidenced on the March 9 x-rays. We acknowledge that it is humanly possible for a trained eye to detect the subtle abnormalities shown in those x-rays. It must be noted, however, that of the several physicians who treated plaintiff, not one detected the injury until after plaintiff failed to respond to treatment over a two week period. Physicians cannot be held to a standard of perfection. From time to time, even the most skilled physician, in the exercise of the utmost care, makes mistakes. These instances *Page 61 
of human imperfection, including Dr. Gaba's, do not rise to the level of medical malpractice. Malpractice occurs only when the physician's actions or omissions are not within the required standard of care."
We agree that the lack of care alleged by the appellant in this case is not so apparent so as to make expert evidence unnecessary. See Lloyd Noland Foundation, Inc. v. Harris,295 Ala. 63, 66, 322 So.2d 709, 712 (1975). Indeed, a showing by the appellant that an unfortunate result has followed from Dr. Gaba's early misdiagnosis of his hand injury, does not shift the burden of proof; the appellant must still show negligence in the diagnosis or treatment. See Torrance v. Wells, 219 Ala. 384,389, 122 So. 322, 326 (1929); Carraway v. Graham, 218 Ala. 453,456, 118 So. 807, 809 (1928). Furthermore, not one of the expert witnesses testifying imputed negligence to Dr. Gaba. SeeCarraway v. Graham, supra, 218 Ala. at 457, 118 So. at 811.
The appellant's own expert medical testimony established that the appellant's injury was very rare and difficult to diagnose. In fact, appellant offered the following statement from a medical text entitled Fractures, Dislocations, and Sprains:
 "The obvious clinical deformity that one might expect to see with this injury [carpal, metacarpal dislocations] is often obscured by marked swelling of the hand. The fact that many of the metacarpal dislocations reported in the literature were missed on initial examination implies that the diagnosis is not always immediately obvious. . . ."
Dr. Hillyer, an orthopedic surgeon with special training in hand surgery, testified that he had never seen an injury like the appellant's. Only Dr. Hordurski testified that he had ever treated such an injury. The expert testimony at trial was in total agreement with Dr. Hillyer that the subtle misalignment shown in the March 9 X-rays "could be easily overlooked by anyone, by himself, by a radiologist, by an emergency room physician, or by another orthopedist."
Dr. Gaba, when questioned by the appellant's counsel, stated that while three X-rays are normally made, a P-A view, a lateral view, and an oblique view, when he viewed the X-rays on March 10, he was informed, upon his inquiry, that there were only two views taken. Sandra Hoots had testified that there were three views taken, but Dr. Gaba testified he only viewed two. He testified that he saw neither a fracture nor dislocation in either of the two X-rays and that there was no sign of osteomyelitis, only soft tissue swelling on the dorsum of the hand. Upon further questioning by the appellant's counsel regarding the lack of a third X-ray, Dr. Gaba explained that he did not inquire about a third view because oftentimes the three standard views are not taken on a part of the body because it is too painful for the patient and thus it is not a standard procedure to question the absence of a particular X-ray view. He stated, in retrospect, that the third view would not have helped. Dr. Gaba likewise testified that he did not have the benefit of a history of the injury and that ninety percent of the time, the X-rays are unaccompanied by a history of the injury.
From Dr. Gaba's testimony and the testimony of the other medical experts, the worst that can be said about Dr. Gaba's March 10 diagnosis report is that he made an "honest mistake on a matter which was `subject to reasonable doubt.'" Underwood v.Holy Name of Jesus Hospital, 289 Ala. 216, 223, 266 So.2d 773,779 (1972); Moore v. Smith, 215 Ala. 592, 111 So. 918 (1927). After a thorough review of the record here, we conclude that there was a clear absence of expert testimony to the effect that Dr. Gaba's actions were of a negligent nature. Without the benefit of expert opinion to impute negligence, the jury could not know or conclude from common knowledge that Dr. Gaba's failure to diagnose the plaintiff's rare hand injury was in any way negligent.
We hold that under the facts and testimony of this case, the necessary scintilla of evidence for the plaintiff was lacking; *Page 62 
therefore, the trial court properly granted a directed verdict.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.