This is an appeal by the plaintiff, Christine Powell, from a judgment in favor of the defendant, Julius Mullins, M.D., based upon a directed verdict entered at the close *Page 1120 
of the plaintiff's evidence in a medical malpractice case. It is undisputed that the defendant left an 18-inch-square surgical lap sponge inside the plaintiff when closing the abdominal incision necessary for the cesarean delivery of the plaintiff's third child. The trial court, believing the case to be controlled by Gilbert v. Campbell, 440 So.2d 1048 (Ala. 1983), granted the defendant's motion for directed verdict because the plaintiff failed to "put on medical testimony to say that the standard of care accepted in that particular field was not followed." We reverse and remand.
The relevant facts of the case are as follows:
The plaintiff entered the University of South Alabama Medical Center for delivery of her third child. Plaintiff had received her pre-natal care through the Medical Center and, initially, her doctors there felt she would be able to deliver her baby vaginally. However, because plaintiff is a diabetic on insulin, the baby (weighing 9 1/2 lbs.) had grown too large to deliver vaginally, and the decision was made to deliver the baby by cesarean section. The defendant, Dr. Mullins, was the chief resident in obstetrics at the Medical Center and the attending physician in charge of performing the cesarean section on the plaintiff. Dr. Mullins was assisted by two other doctors. Also present in the operating room were several people from the anesthesiology department, several nurses, a respiratory therapist, and a pediatrician. Plaintiff was given a general anesthetic despite the fact that her obesity and heavy smoking posed a greater risk in using general anesthesia. These factors, as well as plaintiff's low blood count and profuse bleeding during surgery, established her to be a high-risk patient overall.
While performing the cesarean surgical procedure, which lasted over two hours, the defendant used two rolled up 18-inch-square lap sponges, placing them inside plaintiff's abdomen on either side of the uterus. Twenty-eight other sponges were used during the procedure to soak up blood, but only the two 18-inch-square lap sponges were actually placed inside the plaintiff's abdomen. Despite the defendant's own search of the operative field in preparing to close the incision, as well as two reports given by a nurse that the sponge count was correct, one of the 18-inch-square lap sponges was left inside the plaintiff.
Approximately four days after her surgery, the plaintiff began to complain of pain and swelling on one side. X-rays were taken, revealing the presence of the sponge in plaintiff's abdomen. Five days after the cesarean section, plaintiff underwent a second surgical procedure to remove that sponge.
The only issue presented by this case is whether, on these facts, in order to defeat a motion for directed verdict, plaintiff was required by law to put on expert medical testimony to establish that the defendant's treatment fell below the professional standard of care. We hold that she was not required to do so under these facts.
 I.
The general rule in Alabama is that in medical malpractice cases expert medical testimony is required to establish what is and what is not proper medical treatment and procedure. An exception to this general rule exists where an understanding of the doctor's alleged lack of due care or skill requires only common knowledge or experience. This rule and the exception were explained by this Court in Parrish v. Spink, 284 Ala. 263,266-267, 224 So.2d 621, 623-624 (1969):
 "Ordinarily, in a malpractice case, proof as to what is or is not proper practice, treatment, and procedure, can be established only by expert medical evidence. Snow v. Allen, 227 Ala. 615, 151 So. 468. In such a case lack of expert testimony results in lack of proof of negligence and such proof is essential to establish a plaintiff's case.
 "An exception to the above rule is applied to those cases where a physician's or surgeon's want of skill or lack of care is so apparent as to be within the *Page 1121 
comprehension of laymen and to require only common knowledge and experience to understand it, then expert evidence is not required. See 141 A.L.R. pps. 12, 13, for citation of innumerable authorities.
 "Those cases which have applied the above rule concern the leaving of objects in a patient's body, such as forceps, gauze, sponges, needles, etc., (see 162 A.L.R. 1299), or injuries to the body remote from the area of the operation, such as an injury to an arm and shoulder during an operation for appendicitis, (Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258), or an injury to an eye during the same type of operation. (Meadows v. Patterson, 21 Tenn. App. 283, 109 S.W.2d 417).
 "In such situations it has been held by many courts that the facts themselves established negligence without the need for expert medical testimony, and the case should go to the jury either under the doctrine of res ipsa loquitur, or on the basis that upon the plaintiff showing such facts, the burden of going forward with a defense is then upon the defendant.
 "In a number of our cases this court has held that under the facts of the particular case then being considered, the doctrine of res ipsa loquitur was not applicable. Dabney v. Briggs, 219 Ala. 127, 121 So. 394; McKinnon v. Polk, 219 Ala. 167, 121 So. 539; Carraway v. Graham, 218 Ala. 453, 118 So. 807; Ingram v. Harris, 244 Ala. 246, 13 So.2d 48; Moore v. Smith, 215 Ala. 592, 111 So. 918; Watterson v. Conwell, 258 Ala. 180, 61 So.2d 690.
 "These statements made under the particular facts of the case then being considered [have] led counsel for appellee to assert that `res ipsa loquitur does not apply in malpractice cases.' This statement we consider is not borne out upon analysis of our cases.
 "But be that as it may, in Sellers v. Noah, 209 Ala. 103, 95 So. 167, this court wrote:
 "`Where a surgeon performing an operation leaves in the body of his subject, closing the wound, a foreign substance that causes injury or damage to the subject, the burden of proof passes to the impleaded surgeon to show that he exercised the stated reasonable and ordinary care, skill, and diligence in respect of the operation upon his subject, including the process of closing the wound. Davis v. Kerr, 239 Pa. 351, 86 A. 1007, 46 L.R.A., N.S., 611; 21 R.C.L. p. 407, § 49.'
 "Thus, whether a plaintiff in a malpractice suit be relieved of presenting expert medical testimony after producing evidence demonstrating lack of due care apparent as a matter of common knowledge, the result is the same whether it be reached by application of res ipsa loquitur, or by casting the burden upon the physician of going forward with his defense. We see no need to falter over phraseology."
This general rule, as well as the exceptions thereto, were reiterated by this Court in the recent case of Holt v. Godsil,447 So.2d 191, 192-193 (Ala. 1984):
 "To establish a physician's negligence, the plaintiff must ordinarily proffer expert medical testimony as to what is or is not the proper practice, treatment, or procedure. See Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969).
 "The following situations have been recognized as exceptions to the general rule: (1) where a foreign instrumentality is found in the plaintiff's body following surgery, Sellers v. Noah, 209 Ala. 103, 95 So. 167 (1923); (2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment, Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969); (3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice, Zills v. Brown, 382 So.2d 528 (Ala. 1980); and (4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct, Lamont v. Brookwood *Page 1122 Health Services, Inc., 446 So.2d 1018 (Ala. 1983).
See also Tant v. Women's Clinic, 382 So.2d 1120, 1121 (Ala. 1980), where this Court stated:
 "Only in the most extreme cases will the jury be permitted to find professional misconduct, resulting in injury within the doctor/patient relationship, absent expert testimony as to the standard of care which the doctor is alleged to have breached. The rule is summarized at 61 Am.Jur.2d, Physicians, Surgeons, etc., § 202 (1972), p. 337, that expert testimony is usually `an indispensable prerequisite to the establishment of liability in obstetrical malpractice cases.' See, also, Thomas v. Berrios, 348 So.2d 905 (Fla.App. 1977)."
Thus, this case falls squarely under the exception applied inSellers v. Noah, 209 Ala. 103, 95 So. 167 (1923), where the defendant doctor performed an appendectomy on the plaintiff, leaving a needle or part of a needle inside the plaintiff. The defendant, however, argues to this Court (and persuaded the trial court) that the present case is controlled by Gilbert v.Campbell, 440 So.2d 1048 (Ala. 1983), in which this Court stated:
 "Gilbert urges us to apply the doctrine of res ipsa loquitur to this case. He argues that he has established a prima facie case of negligence against Dr. Campbell under the doctrine of res ipsa loquitur. We have never held that this doctrine may be used in a medical malpractice action to prove negligence. The rule in Alabama is that expert medical testimony is required to establish what is and what is not proper medical treatment and procedure. See, Moses v. Gaba, 435 So.2d 58 (Ala. 1983)." 440 So.2d at 1049.
As defendant admits in his brief, Gilbert is "a case which appears on first blush to fall within the exceptional rule, obviating the need for expert testimony, [but] is actually oneinvolving complex medical circumstances beyond thecomprehension of a layman." However, it is precisely thisfactor that distinguishes Gilbert from the present case and which indicates that the holding in Gilbert is in no way contrary to the exception applied in Sellers v. Noah, supra, and stated in Parrish v. Spink and Holt v. Godsil, supra.[1]
The defendant doctor in Gilbert had performed surgery on the plaintiff to remove a tumor in the colon. Twice, five months and six months following his surgery, the plaintiff was readmitted to the hospital for treatment of infections in the same area of the abdomen. During both stays, Penrose drains were inserted through his rectum to drain infected material from a pelvic abcess. The first drain came out on its own and the second was pulled out routinely. The plaintiff's infections persisted and, eventually, a fistula, or tunnel between the abcess and the exterior left buttock developed. The following year, the plaintiff was referred to another physician, who closed off the fistula surgically from the inside. While performing this procedure, the physician found and removed a 2-inch-long piece of Penrose drain in the tract of the fistula.
In affirming a verdict directed in favor of the defendant at the close of the defendant's case,[2] this Court held that expert testimony was required "to describe the proper use, purpose, insertion and removal of a Penrose drain." 440 So.2d at 1049.
Without question, the circumstances in Gilbert, supra, involved complex medical procedures beyond the comprehension of a layman. In that case, the mere presence of the broken piece of drain in the plaintiff's body was not enough to establish a prima facie case of negligence for several reasons. First, the drain did not show up on X-rays, and it could not have been seen by an external examination. Second, due to the nature and severity of the plaintiff's illness, the defendant had no reason to *Page 1123 
believe that plaintiff's suffering was caused by something other than his disease. Third, in presenting his case, the defendant put on undisputed expert testimony that not only was there no standard practice or procedure whereby a doctor, after removal, could determine whether the full length of the drain had been removed, but also that the defendant had engaged in no substandard medical practice in the course of his treatment of the plaintiff.
In the present case, the plaintiff's obesity and profuse bleeding probably made locating the sponges more difficult. Also, because the procedure had taken over two hours, and because the plaintiff, a smoker, was a higher risk for general anesthesia, the defendant was understandably anxious to complete the procedure and close the patient. Nevertheless, it is precisely these factors that put the plaintiff in a high-risk category warranting an X-ray immediately following the surgical procedure.
At trial, the defendant testified that the plaintiff was a high-risk patient, but that it was not customary to do a post-operative X-ray unless the patient began having problems:
 "Q. [I]s she considered to be a high risk patient because she's obese?
"A. Yes, sir.
 "Q. What does smoking have to do with you leaving a towel in her?
 "A. It has absolutely nothing to do with me leaving a towel in her but it has a whole lot to do with her risk of anesthesia.
 "Q. Is it customary — do you conclude that this is a high risk patient?
"A. Yes, sir.
 "Q. Because she's obese and because she's a smoker. Any other reason why she would be a high risk patient?
 "A. Cause we were going to be using general anesthesia and her blood count was probably suboptimum. You know, lower than it would be ideally.
 "Q. Well, with a high risk patient, is it customary to take an X-ray after surgery?
 "A. If they're having problems with pain or anything.
"Q. Did you take one of her?
"A. Four days after the surgery.
 "Q. Four days after surgery. But that's not customary, is it, to wait four days? Is it, Doctor?
 "A. It's customary to do the X-ray when the patient starts having problems. And that's when she started having problems."
However, admitted into evidence was an article entitled "Natural History of the Retained Surgical Sponge," written by John W. Hyslop, M.D., and Kimball J. Maull, M.D., which appeared in the June 1982 edition of the Southern Medical Journal, Volume 75, No. 6, at pages 657-680. Counsel for the defendant conceded the article to be a recognized medical text. The article contained the following explanation especially relevant to the facts of this case:
 "Several factors appear to enhance the chances of unintentionally leaving a surgical sponge or laparotomy pad behind. At celiotomy [surgical incision of the abdomen], changes in the operative field and movement of the intestines may obscure foreign bodies. This is especially true in pelvic surgery, which is the procedure most frequently associated with retained sponges. The duration and complexity of the operation may distract the surgeon and lessen his awareness of retained packs. This situation may be aggravated by time pressures if the patient's condition is unstable. . . . " (Emphasis added.)
In addition to the portion of the defendant's testimony quoted above, the following excerpts from his testimony indicate that the high-risk factors outlined in the above-quoted article were present in this case:
 "Q. And have you ever left a towel inside a patient before?
"A. No, sir.
"Q. Why did you do it on this occasion?
". . . .
 "A. Well, Ms. Powell was quite large and she was asleep and she had a quite *Page 1124 
large baby. And she was a heavy smoker. And she was asleep and she was losing a lot of blood. And I was instructed by my superiors to put a small rolled up lap towel on either side of the uterus during a C-section. And at the time we were closing and the nurse counted the lap sponges, she reported the count as correct.
". . . .
 "Q. And she was a high risk patient. Did you ever make a body cavity search after the baby was delivered?
"A. Yes, sir.
 "Q. You did? One more time. Did you make a body cavity search after the baby was delivered?
"A. Yes, sir.
"Q. How come you didn't find the towel?
"A. I really can't answer that. It was human error.
 "Q. Well, if you made a search and they told you about putting these two towels in there, you would have found it, wouldn't you? You didn't look, did you, Doctor?
 "A. Yes, sir, we did look. This lady was bleeding rather profusely. She had to have blood, several units of blood.
". . . .
 "Q. Talking about these sponges, Doctor, what happens to these sponges when they are placed into the open cavity of a patient undergoing surgical procedures such as a C-section?
 "A. Well, they suck up a lot of blood and body fluids.
 "Q. Do they just lay right out there where you can see them?
"A. No, sir.
 "Q. Do they sometimes get behind organs and intestines and other places?
 "A. They get behind intestines and behind the uterus.
". . . .
 "Q. Was this a difficult procedure to perform on this patient?
 "A. Yes, sir, it was. It was very difficult. She was overweight and she bled a whole lot.
". . . .
 "Q. I know you said you probed for the sponges and you didn't find this one. Did you count these sponges yourself?
"A. No, sir.
"Q. Why didn't you count them?
 "A. I was concerned with closing the incision and stopping her from bleeding.
". . . .
 "A. . . . In a C-section it is very bloody because you cut through a very bloody area. You have probably 700 c.c.'s of blood loss in a normal uncomplicated thin patient. And with someone who is obese and who has been in labor all day, you are going to lose more blood especially with a large baby like she had."
Under the sub-heading entitled "Prevention," the Southern Medical Journal article provides the following:
 "The key to preventing retained surgical sponges or packs is to routinely inspect the operative field and body cavity and recognize the fallibility of sponge counts. Although routine intraoperative roentgenograms [X-rays] cannot be justified on a cost basis despite anecdotal experience in the literature, appropriate films should be considered in the high-risk patient and taken before the patient leaves the operative suite whenever possible." (Emphasis added.)
In Zills v. Brown, 382 So.2d 528 (Ala. 1980), this Court stated with approval another exception to the general rule requiring expert testimony in a medical malpractice case:
 "Ordinarily, the law requires expert medical testimony as to what is or is not the proper practice, treatment, or procedure, in a medical malpractice case; the lack of such evidence is a lack of proof of negligence and is fatal to a plaintiff's case. Parrish v. Spink, supra. Some of the exceptions to this rule are stated in Parrish. Among other exceptions are those instances where a recognized *Page 1125 standard or authoritative medical text or treatise is employed to prove what is or is not proper practice, treatment, or procedure. . . ." (Emphasis added.) 382 So.2d at 531.
In view of the defendant's own testimony that the plaintiff was a high-risk patient, the article quoted from above, which was admitted into evidence, can be viewed as proof of what is or is not proper practice, treatment, or procedure. While the article does not mandate that X-rays be taken in all cases, it does indicate that the proper practice should be at least toconsider taking X-rays of high-risk patients before they leave the operative suite. This the defendant did not do. In fact, he testified, in effect, that X-rays are not considered unless the patient begins to experience problems post-operatively.
Furthermore, the facts of the present case are substantially dissimilar to those in Gilbert. It cannot be said that the "proper, use, purpose, insertion, and removal," Gilbert, supra, of a surgical sponge during a cesarean section is a medical procedure as complex as the use, purpose, insertion, and removal of a Penrose drain in a patient on whom colonic surgery had been performed to remove a tumor and who had subsequently suffered with serious infections related to his diseased colon. Thus, in Gilbert, the mere fact that a small piece of a Penrose drain remained in the patient, after all the drains used were actually removed (and appeared to have been removed in their entirety) did not demonstrate an apparent lack of skill or due care on the part of the defendant which was capable of being understood by a layman. In the factual context of this case, however, the complete failure of the defendant to remove the sponge at all demonstrates a lack of care that is within the comprehension of a layman and requires only common knowledge and experience to understand it. Parrish v. Spinks; Sellers v.Noah, supra. See also Lloyd Noland Foundation, Inc. v. Harris,295 Ala. 63, 322 So.2d 709 (1975). Therefore, the plaintiff was not required to put on expert testimony in order to overcome defendant's motion for directed verdict at the close of plaintiff's case.
 II.
Despite the defendant's own testimony that his failure to find the sponge during his search of the body cavity was "human error," on appeal the defendant contends that he cannot be liable in negligence to the plaintiff because, he argues, the sponge was left in due to the error of the nurse in charge of the sponge count, on whose "correct" count the defendant claims he reasonably relied. We cannot agree. At trial, the defendant gave the following testimony regarding the sponge count:
 "Q. Who had the duty or responsibility of keeping up with the sponge count?
 "A. The sponge count is the responsibility of the scrub nurse and the circulating nurse.
 "Q. Before you close up an operative site and particularly this operative site on Ms. Powell, do you receive any information from the scrub nurse and circulating nurse about the sponges?
"A. Yes, sir.
"Q. What is that?
 "A. If the count is not correct, they tell us just before we start to close the abdomen. And if it's correct, they tell us that also.
"Q. And you were told that in this case?
"A. I was told it was correct.
 "Q. Now, you stated here that it's not the standard of care to leave a sponge in a patient, have you not?
"A. That's correct.
"Q. Why is that?
 "A. Because when you do they get sick and have problems.
 "Q. I'd like to ask you, Doctor, based on your training and experience whether or not you have an opinion as to whether you think you deviated from the standard of care as other physicians in the national medical community under similar circumstances in performance of a C-section on Ms. Powell and in the care and treatment you gave to this patient? *Page 1126 
"A. No, I do not.
"Q. Even though a sponge was left?
 "A. That's correct. The nurse told me the count was correct and that signaled me that the count was correct and I could close the patient.
 "Q. Do surgeons rely on the nurses when they tell them that the sponge count is correct?
"A. Very much.
 "Q. Is that their job in the operating room, to keep up with those sponges?
"A. Yes, sir.
". . . .
 "Q. You still understand it was your responsibility to see that there weren't any towels or sponges in the patient when you sewed it up?
 "A. It was my understanding that if the count was correct there were no towels in the patient.
 "Q. I understand. But you understand it was your responsibility to see that there weren't any towels there?
 "A. I understand that I have a personal responsibility for that patient and her health."
Unquestionably, it was the defendant's responsibility toremove all sponges from inside the plaintiff before closing the abdominal incision. This rule is stated generally at 61 Am.Jur.2d, Physicians and Surgeons, etc., § 258, p. 397 (1981):
"§ 258. — Leaving foreign substance in wound.
 "A surgeon undertaking to perform an operation requiring the placing of sponges in the incision does not complete his undertaking until the sponges are properly removed. . . ."
Under our cases, a failure to remove sponges, needles, etc., which are placed inside the patient during the operation constitutes prima facie evidence of negligence. See Sellers v.Noah and Parish v. Spinks, supra. The responsibility to remove the sponges was that of the doctor and not that of the nurses assisting him. He exercised exclusive control over the sponges from the time he placed them inside the plaintiff until he removed them. The mere fact that the defendant delegated the task of counting the sponges, once he had removed them from the patient, does not, in any way, relieve the defendant of his responsibility to remove them in the first instance. He had the duty and responsibility of removing all the sponges. The nurses' responsibility of counting them afterward amounts to only an added precaution taken by the defendant to help insure that he had properly performed his duty.
The general rule with respect to the "sponge nurse" is stated and explained at 61 Am.Jur.2d at 399:
 "While the custom or usage of having a `sponge nurse' account, both before and after a surgical operation, for all sponges used during the operation has been approved by some courts, it is generally held that surgeons cannot relieve themselves from liability for injury to a patient caused by leaving a sponge in the wound after an operation, by the facts that such custom or usage prevails in the community, and that they followed and relied on such count as conclusive that all sponges had been accounted for.
The reason for this rule is that leaving a surgical sponge in the abdominal cavity is a sort of case in which the type of harm itself raises so strong an inference of negligence, and the physician's duty to prevent harm is so clear, that expert testimony is not required to establish the prevailing standard of care, and the inference arising from res ipsa loquitur is not refuted by the assertion that the nurse's sponge count was reported as in order, because such a report does not relieve the operating and supervising surgeon of his responsibility. . . ."
(Emphasis added.)
We adopt the general rule as stated above as well as the reasoning of the Louisiana Court of Appeal, which addressed this same issue in the case of Guilbeau v. St. Paul Fire andMarine Ins. Co., 325 So.2d 395 (La.Ct.App. 1975), a case similar to the present one. In Guilbeau, it was undisputed *Page 1127 
that a surgical pad or sponge was left inside the plaintiff's abdomen following a surgical procedure performed by the defendant doctor. Just as in the present case, the defendant received more than one "correct" sponge count before closing the incision. He argued that it was within the standard of care "to rely on the `sponge count' of the nurses and a visual inspection of the area of surgery prior to closure to prevent the error committed in this case." Guilbeau, at 397. The Louisiana Court of Appeal followed the holding of the Louisiana Supreme Court in Grant v. Touro Infirmary,254 La. 204, 223 So.2d 148 (1969), and explained that case as follows:
 "In that case suit was brought against the hospital, its insurer and the operating surgeon's liability insurer for damages sustained by the plaintiff as a result of a sponge being left in her body following surgery. In finding personal negligence on the part of the operating surgeon, the Supreme Court set forth the following statement of law:
 "`The general rule . . . is that a surgeon's failure to remove a sponge or pad before closing an incision may be regarded as negligence per se, and some authorities hold that the surgeon cannot relieve himself from liability for injury to a patient caused by leaving sponges or pads by reliance on a custom or rule requiring the attending nurse to count the sponges or pads used and removed, and on the nurse's statement as to the count.
 "`Albeit there is authority to the contrary, we are convinced that the general rule is sound.' 223 So.2d at 154-155.
 "In Grant, the Supreme Court was faced with the fact that a sponge had been left in the plaintiff's body following surgery. The fact that it had been placed there during surgery by the surgeon and not removed by him before closure constituted negligence per se on his part, and the fact that he had complied with the `community standard' in relying on the nurse's sponge count did not exonerate him. In the present case we are faced with the same situation. A laparotomy pad was placed in plaintiff's body by the surgeon during surgery and was left there following surgery, and defendant attempted to show that the procedure used by the surgeon to prevent leaving any sponges or pads in the patient was in complete accord with the community practice. Grant requires that we find the operating surgeon negligent per se."
(Emphasis added.)
Based on the foregoing, we conclude that this case does "fall within the exception that would allow a jury to exercise its fact-finding prerogative to adjudge liability absent expert testimony." Tant v. Women's Clinic, 382 So.2d 1120, 1121 (Ala. 1980) (exception recognized, but issue not presented). Accordingly, the trial court erred in directing a verdict in favor of the defendant, and, therefore, the judgment is due to be, and it hereby is, reversed and the case remanded for further proceedings.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.
[1] It is worth noting that neither Sellers nor Parrish was cited in Gilbert, and the Holt opinion was issued subsequent toGilbert.
[2] Another distinguishing factor worth noting is that the verdict in the present case was directed at the close of theplaintiff's case.