This is an appeal from a judgment based on a jury verdict rendered in favor of Dr. Boyce J. White, Jr., and a directed verdict granted in favor of Drs. Suraj Sancheti and H.B. Thompson. Appellant brought this action against appellees, alleging that they had committed medical malpractice while treating plaintiff's decedent. Another defendant, Alaco Discount Pharmacy, Inc. ("Alaco"), was dismissed after entering into a pro tanto settlement with appellant. Two issues are presented: (1) Whether the trial court erred in directing a verdict in favor of Drs. Sancheti and Thompson; and (2) Whether the trial court erred in presenting certain charges to the jury.
Plaintiff's decedent, Lorene Camp, 50 years of age at her death, suffered from chronic obstructive pulmonary disease ("COPD"). There is no known cure for COPD and doctors can do no more than control and alleviate the symptoms. The primary symptom is difficulty in breathing. A major concern is the susceptibility of the patient to infection. Mrs. Camp had suffered from COPD for a long time when she made her first visit to Dr. Sancheti in August of 1978. By that time her disease had progressed to a critical point. She was admitted into a hospital then and on nine more occasions prior to her last admission in August 1982. She began using oxygen at home in 1980. By 1982 she required oxygen from eight to ten hours per day. Dr. Frank Sutton, Jr., a specialist in the diagnosis and treatment of COPD, was called by the plaintiff as an expert witness. He gave his opinion that Mrs. Camp's life expectancy as of 1980 would have been around five years and in no event greater than eight. Dr. Sancheti described Mrs. Camp's condition as being in the terminal stage. Nevertheless, after her hospitalization in March of 1982, Mrs. Camp's condition was stable.
During this period, Mrs. Camp developed a sinus problem. She was treated for this problem by Dr. White, an ear, nose, and throat specialist. In the treatment of her sinus problem, Mrs. Camp was erroneously provided with the drug Inderal following a prescription issued by Dr. White and filled by Alaco. Inderal is a drug used primarily in the treatment of heart disease. It acts to settle the heart rhythm and reduce high blood pressure. It also blocks certain nerve fibers in the airways to the lungs. This secondary effect can cause spasms of the bronchial tubes. According to Dr. Sutton's testimony, if someone with an advanced case of COPD took a capsule of Inderal that person almost certainly would experience a bronchospasm that would have serious, if not fatal, consequences. Within two hours of taking one Inderal capsule, Mrs. Camp began to experience difficulty in breathing. She was taken to the hospital emergency room on August 30, 1982, and admitted to the hospital. She remained there until her death on October 3, 1982.
Dr. Sancheti took charge of Mrs. Camp's treatment following her last admission. Medication was administered to counteract the effects of the Inderal. However, Mrs. Camp's condition did not improve, so she was placed in the intensive care unit and connected to a respirator-ventilator. This involved inserting an endotrachial tube through her mouth and into her lungs so that the machine could breathe for her. Theretofore, Mrs. Camp's condition had not required mechanical ventilation. Feeding through a nasogastric tube was begun on September 1. By September 3, she had begun to run a fever and she subsequently *Page 168 
developed pnuemonia. Beginning September 4, broad spectrum antibiotics were administered to treat the pneumonia. On September 7, it became necessary to replace the endotrachial tube with a tracheostomy. This secondary procedure involved making an opening in the trachea and inserting the breathing tube directly into the trachea.
Her pneumonia responded to the antibiotics and had cleared by September 15. This was confirmed by X-rays, her white blood count, the absence of fever, and the sound of her chest. Dr. Sanchetti discontinued the antibiotics, having determined that Mrs. Camp was free of infection.
Because of concern over the deleterious effects which result from prolonged attachment to a breathing machine, Dr. Sancheti was anxious to get Mrs. Camp off the machine. Patients so attached lose muscle mass and experience loss of coordination of their respiratory system. This problem becomes acute in someone with advanced COPD. To assist him in weaning Mrs. Camp from the machine, Dr. Sancheti called in Dr. H.B. Thompson. Dr. Thompson was a specialist in lung problems. The two doctors worked to strengthen Mrs. Camp and monitored her progress. By September 20 Mrs. Camp had begun to take nourishment by mouth. The doctors concluded that she had been strengthened as much as possible. On that day, she was disconnected from the respirator-ventilator and transferred out of the intensive care unit.
Mrs. Camp appeared stable for two or three days. Then her condition began to deteriorate. It became obvious that she could not survive on her own and would have to be reattached to the breathing machine in order to live. In the judgment of Drs. Thompson and Sancheti, that would have been a permanent arrangement. The doctors decided that the time had come to discuss the situation with Mrs. Camp's family. A consultation was arranged and the doctors informed the family of the situation and conveyed to them their recommendation that Mrs. Camp not be put back on the respirator-ventilator. The family in turn consulted with Mrs. Camp. She was informed of her situation and of the doctor's opinion that a return to the breathing machine would be permanent. Mrs. Camp was mentally alert. She made the decision not to return to the respirator-ventilator.
Over the next few days Mrs. Camp grew gradually weaker. She remained alert until nearly the end. As her lungs lost their ability to throw off the carbon dioxide, she grew more and more lethargic and finally comatose. On October 3, 1982, Mrs. Camp died in her sleep.
Patricia Camp, as administratix of her mother's estate, filed this action on January 18, 1983. In her original complaint she alleged that Dr. White or Alaco had negligently or wantonly prescribed or negligently or wantonly filled the prescription and that the negligence or wantonness resulted in Mrs. Camp's taking the tablet of Inderal. Subsequently, the complaint was amended to add Drs. Sancheti and Thompson. The amended complaint alleged that Drs. Sancheti and Thompson negligently or wantonly treated or omitted to treat Mrs. Camp. Prior to trial, defendant Alaco entered into a pro tanto settlement with the plaintiff. After presentation of the evidence, Drs. Sancheti and Thompson moved for a directed verdict. The trial court granted their motion and entered judgment in their favor. The claim against Dr. White was submitted to the jury, which returned a verdict in his favor.
 I.
Appellant contends that the trial court erred in granting the directed verdict. Appellant argues that there was at least a scintilla of evidence as to three areas of liability on the part of Drs. Sancheti and Thompson.
Her first contention is that Mrs. Camp suffered from a treatable pseudomonas[1] infection and that Drs. Sancheti and Thompson negligently failed to treat this *Page 169 
infection. A thorough review of the evidence indicates that appellant's contention is nothing more than conjecture. The proof upon which appellant relies consists of a medical treatise, which was introduced into evidence, and the testimony of Drs. Sancheti, Thompson, and White. The treatise,Harrison's Principles of Internal Medicine, states general principles regarding diagnosis and treatment of various infections that exist in a hospital environment. Appellant refers to passages in this book as "clearly stat[ing] that pseudomonas is a clinically significant infection which should be watched for especially in patients with chronic obstructive lung disease, and that substituting a broad spectrum antibiotic is unwise and dangerous and . . . if inadequate or wrong may only suppress symptoms temporarily without effecting a cure." She links these statements to the testimony of the treating physicians elicited at trial in response to her questions, which were typically prefaced by such qualifying phrases as "this could be," "this might be," or "isn't it possible." The defendant doctors in every instance explained that the characterizations made by appellant did not apply to Mrs. Camp. No evidence to rebut their testimony exists in the record. The treatise introduced by appellant tended to corroborate the assessment of Drs. Sancheti and Thompson:
 "Respirator tract. Primary Pseudomonas pneumonia is infrequent, and culture of this organism from the sputum [mucus] usually is indicative of aspiration [suctioning] of oropharyngeal [throat] contents with secondary infection or superinfection following eradication of a more sensitive flora [bacteria] with antibiotics. . . . The organism is often isolated from the sputum of patients with . . . chronic bronchitis. . . ."
p. 798. Dr. Sutton, plaintiff's own medical expert, testified that the records he had reviewed indicated that Mrs. Camp had received excellent care at the hands of Drs. Sancheti and Thompson.
Aside from the conjectural nature of the allegation that Mrs. Camp had a pseudomonas infection, appellant has failed to introduce any evidence that such an infection, if present, contributed to Mrs. Camp's death.
Appellant next argues that Drs. Sancheti and Thompson were negligent in failing to inform Mrs. Camp of her condition and of possible alternatives. This second argument fails because it assumes as factual, or at least as arguably factual, premises for which there is no support in the record. In her brief, appellant states that the doctors failed to inform Mrs. Camp that she "had a pseudomonas infection, that this infection was treatable . . ., or that she could be weaned off the respirator." As has already been pointed out, appellant has failed to provide any evidence that Mrs. Camp was afflicted with a pseudomonas infection. The same is true of her contention that Mrs. Camp could have been placed back on the breathing machine and gradually weaned off. Appellant elicited testimony from the defendant physicians that it was possible to place patients back on a breathing machine, strengthen them, and wean them off. They testified that there were doctors who specialized in treating such patients. But they also testified that Mrs. Camp was not a candidate for such a procedure. They held firm to their original opinion: if Mrs. Camp was reattached to the respirator-ventilator, it would be on a permanent basis. No evidence was introduced to contradict the doctors' testimony on this point. There being no evidence of a treatable infection and no evidence of a viable procedure for weaning Mrs. Camp off the ventilator, there is nothing to support appellant's contention that the defendant doctors failed to properly inform Mrs. Camp.
The third contention which appellant raises as to Drs. Sancheti and Thompson is that they violated Alabama's Natural Death Act by failing to get from Mrs. Camp her written consent to withhold life sustaining procedures. Appellant argues that the Act requires that a decision to terminate life support be in writing. Appellant has misread the statute. Code 1975, §22-8A-1 et seq., provides a method for assuring that such a decision by an individual will be respected. It also provides *Page 170 
protection for a physician who withholds life support in compliance with an executed declaration. However, the statute is cumulative and does not provide the exclusive procedure for withholding life sustaining systems. Section 22-8A-9 provides:
 "(d) Nothing in this chapter shall impair or supersede any legal right or legal responsibility which any person may have to effect the withholding or withdrawal of life-sustaining procedures in any lawful manner. In such respect the provisions of this chapter are cumulative.
 "(e) This chapter shall create no presumption concerning the intention of an individual who has not executed a declaration to consent to the use or withholding of life-sustaining procedures in the event of a terminal condition."
The trial court's judgment entered in favor of Drs. Sancheti and Thompson is due to be affirmed.
 II.
The second issue is whether the trial court erroneously charged the jury.
Dr. White testified that the drug he prescribed was Endal, not Inderal. Endal is a decongestant commonly used to treat the sinus problem Mrs. Camp was having. Dr. White had his nurse, Mrs. Moon, telephone the prescription to Alaco. Somewhere there was a miscommunication. Mrs. Moon testified that she ordered Endal. However, the druggist who filled the prescription testified:
 "A. No, sir, directions were given Inderal every four hours, and, of course, I posed the question to the voice on the phone 'Inderal, 40 milligrams?' And the confirmation was 'yes.'
 "Q. All right, sir. Why would you ask about Inderal, 40 milligrams?
 "A. 40 milligrams being a strength of Inderal and, to my knowledge, one of the most popular. That was the question, if not 40 milligrams, what strength."
There is strong evidence that Mrs. Camp took a capsule of Inderal, which, because of her pre-existing condition of COPD, incited a severe case of bronchospasm and led to her death.
The trial court read to the jury the following charge number 8 requested by Dr. White:
 "I charge you, members of the jury, that in performing professional services for a patient, a registered nurse such as Ruth Moon, must exercise that degree of care, skill and diligence which is ordinarily possessed and used by registered nurses practicing their profession in the same general line of practice ordinarily have and exercise in a like case [sic]. The same general neighborhood means the national medical neighborhood of reasonably competent registered nurses in the same line of practice acting in the same or similar circumstances.
 "I further charge you, members of the jury, that if you are reasonably satisfied in this case that Ruth Moon exercised that degree of care, skill and diligence which is ordinarily possessed and used by registered nurses practicing their profession in the same general neighborhood, then you cannot return a verdict against the defendant Dr. Boyce White in this case."
After the trial court concluded its instructions, counsel for appellant made the following objection:
 "Mr. COLEMAN: And we reserve our — or except again to the Court's giving defendant's written charge 3 and 8. I believe those are the two charges you gave.
"MR. ROBINSON: And 5.
 "MR. COLEMAN: 3, 5 and 8 because there is no evidence here of the standard of care. Mrs. Moon is not supposed to be giving anything, and it gets down to the Inderal to make it one issue only, and we think that does not cover all the case."
While this objection is not a model of clarity, it is sufficient to call the court's attention to the error of giving this objectionable instruction. Rule 51, A.R.Civ.P.
Charge number 8 was clearly erroneous because it instructed the jury that Dr. White could not be held liable if Mrs. Moon abided by the standard of care of a nurse. *Page 171 
This is incorrect and could only have served to confuse the jury. See Powell v. Mullins, 479 So.2d 1119 (Ala. 1985). Because we cannot say that this erroneous instruction could not have affected the jury's verdict, the judgment for Dr. White is due to be reversed.
The judgment is affirmed as to Drs. Sancheti and Thompson and reversed as to Dr. White, and the cause is remanded.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
All the Justices concur.
[1] A subdivision of bacteria. The type which would be of concern here is pseudomonas aeruginosa. It is commonly found in infected areas. Stedman's Medical Dictionary, (5th ed. 1982).