This is an appeal from a $500,000 judgment based on a jury verdict in favor of Sylvia Marie Coats on her medical malpractice claim against Dr. P.B. Ravi, M.D.; the Health Care Authority of Athens and Limestone County d/b/a Athens-Limestone Hospital; and Cathy Foxworthy and Wilma Vaughn, nurse employees of the hospital. We affirm.
In February 1989, Dr. Ravi operated on Sylvia Marie Coates at Athens-Limestone Hospital to remove an ovarian cyst. Following the surgery, she complained of constipation, and, later, of nausea and vomiting. Although she went to see Dr. Ravi several times between February 1989 and May 1990, the cause of her complaints was not correctly diagnosed. In June 1990, Coates was transported by ambulance to Athens-Limestone Hospital, where another doctor discovered "a large mass in her abdomen," appellee's brief, page 9, and performed surgery a few days later. The "mass" was found to be a lap pad that had been left inside Coates's body cavity during her previous surgery.
Coates thereafter filed a medical malpractice claim against Dr. Ravi, Athens-Limestone Hospital, and the two nurses who had assisted Dr. Ravi in her February 1989 surgery. At trial, she contended that Dr. Ravi and/or the two nurses had negligently and/or wantonly allowed the lap pad to be left inside her body cavity during the 1989 surgery. Although there was undisputed evidence that the lap pad, in fact, had been left in Coates's body during the surgery, there was a dispute at trial as to whether, as alleged by Dr. Ravi, there was a miscount by the two nurses or whether, as alleged by the nurses, Dr. Ravi had taken one of the lap pads for further use after the final count of the pads had been made. The jury returned a verdict against all defendants in the amount of $500,000. The trial court granted the hospital's motion to reduce the judgment against it to $100,000 pursuant to § 11-93-2, Ala. Code 1975, but refused to grant the motion to do likewise for the employees of the hospital, Cathy Foxworthy and Wilma Vaughn.
On appeal, the defendants contend that the trial court erred to reversal in giving the following jury charge:
 "The standard of care to be applied in regard to sponges that are left inside a patient after surgery is that the physician who conducted the surgery bears the responsibility of removing the sponges from the patient's body and cannot by delegating the task of counting relieve himself from the liability of injury to the patient caused by leaving a sponge in the body. [The] fact that all physicians engaged in practice within the defendant's same general neighborhood routinely delegate the task of accounting for surgical sponges and relying on counts given them by other nurses or assistants, does not in itself relieve the physician of the liability for sponges left inside the patient's body."
R.T. at 613 (emphasis added). The jury charge was practically a direct quote from Ravi v. Williams, 536 So.2d 1374, 1376
(Ala. 1988), wherein this Court stated:
 "The standard of care to be applied in regard to sponges or other foreign objects that could be left inside the patient after surgery has been established by several recent cases.
 "The physician bears the responsibility for removing sponges from the patient's body and cannot, by delegating the task of counting, relieve himself from liability for injury to a patient caused by leaving a sponge in the body. The fact that all physicians engaged in practice within the defendant's same general neighborhood routinely delegate the task of accounting for surgical sponges and rely on counts given them by nurses or other assistants does not relieve them of liability when a sponge is left inside a patient's body.
 "The reason for this rule is stated in Powell v. Mullins, 479 So.2d 1119 (Ala. 1985), as follows:
 " 'Unquestionably, it was the defendant's responsibility to remove all sponges from inside the plaintiff before *Page 220 
closing the abdominal incision. This rule is stated generally at 61 Am.Jur.2d, Physicians and Surgeons, etc., § 258, p. 397 (1981):
 " ' "§ 258. — Leaving foreign substance in wound.
 " ' "A surgeon undertaking to perform an operation requiring the placing of sponges in the incision does not complete his undertaking until the sponges are properly removed. . . ."
 " 'Under our cases, a failure to remove sponges, needles, etc., which are placed inside the patient during the operation constitutes prima facie evidence of negligence. See Sellers v. Noah[, 209 Ala. 103, 95 So. 167 (1923),] and Parrish v. Spinks [Spink], [284 Ala. 263, 224 So.2d 621 (1969)]. The responsibility to remove the sponges was that of the doctor and not that of the nurses assisting him. He exercised exclusive control over the sponges from the time he placed them inside the plaintiff until he removed them. The mere fact that the defendant delegated the task of counting the sponges, once he had removed them from the patient, does not, in any way, relieve the defendant of his responsibility to remove them in the first instance. He had the duty and responsibility of removing all the sponges. The nurses' responsibility of counting them afterward amounts to only an added precaution taken by the defendant to help insure that he had properly performed his duty.
 " 'The general rule with respect to the 'sponge nurse' is stated and explained at 61 Am.Jur.2d at 399:
 " ' "While the custom or usage of having a 'sponge nurse' account, both before and after a surgical operation, for all sponges used during the operation has been approved by some courts, it is generally held that surgeons cannot relieve themselves from liability for injury to a patient caused by leaving a sponge in the wound after an operation, by the facts that such custom or usage prevails in the community, and that they followed and relied on such count as conclusive that all sponges had been accounted for. The reason for this rule is that leaving a surgical sponge in the abdominal cavity is a sort of case in which the type of harm itself raises so strong an inference of negligence, and the physician's duty to prevent harm is so clear, that expert testimony is not required to establish the prevailing standard of care, and the inference arising from res ipsa loquitur is not refuted by the assertion that the nurse's sponge count was reported as in order, because such a report does not relieve the operating and supervising surgeon of his responsibility. . . ." (Emphasis added [in Powell].)' "
Ravi v. Williams, 536 So.2d 1374, 1376-77 (Ala. 1988).
In Powell v. Mullins, 479 So.2d 1119 (Ala. 1985), this Court stated that expert testimony was not required in a medical malpractice sponge case in order to establish that the standard of care had been breached. Id., at 1124-25. Powell stands for the proposition that evidence that a sponge was left inside a patient's body cavity is prima facie evidence of negligence. Upon the plaintiff's presentation of such evidence, the burden shifts to the defendant to show that there was no negligence. The defendants in this case contend that the jury charge incorrectly led the jurors to believe that the doctor was guilty of negligence per se. We disagree. Almost immediately before giving the instruction complained of by the defendants, the judge had told the jury:
 "Further, if you find from substantial evidence of the truthfulness of plaintiff's claim that the defendant, P.B. Ravi, left a sponge inside her and sewed her up leaving a sponge inside, that is prima facie evidence of breach of standard care that is required by the defendant, P.B. Ravi. In this case the burden would shift to the defendant, P.B. Ravi, to reasonably satisfy you from the evidence that he did not breach the standard of care required by him."
R.T. at 612.
The Court of Civil Appeals has written: *Page 221 
 "It is the responsibility of this court to look at the entire jury instructions, both the judge's oral charge as well as the written requested charges. Reversal is mandated only when the instructions, viewed in their entirety, are prejudicial. Hargress v. City of Montgomery, 479 So.2d 1137 (Ala. 1985); Underwriters Nat'l Assurance Co. v. Posey, 333 So.2d 815 (Ala. 1976); Park Supply Co. v. Sunki, 386 So.2d 462
(Ala.Civ.App. 1980)."
Coffee County Bank v. Mitchum, 634 So.2d 148, 151
(Ala.Civ.App. 1993). The jury charge was not prejudicial. The trial judge correctly stated the applicable law. The charge complained of merely states that the fact that a doctor delegates the responsibility of counting of sponges to his nurse "does not initself relieve the physician of the liability." There was no error.
Dr. Ravi contends that the trial court erred in overruling objections to certain hypothetical questions asked of the hospital's expert witness. At trial, Dr. Ravi contended that he had relied on the nurses' sponge count and that the count the nurses gave him while he was closing the incision was inaccurate. The nurses, on the other hand, argued that the sponge count they gave Dr. Ravi was accurate and that he must have taken a sponge after they had made the final count and used it while closing the incision. The hospital's expert stated at trial that he had reviewed all of the medical records and documents in this case and, responding to a hypothetical question, made the following statement, based on his review of those documents, the position of the lap pad when it was taken from Coates's body, and his knowledge of the kind of surgery performed:
 "I certainly have an opinion as to how it could be in there, not necessarily seeing it removed in the fashion that it should be as you complete an operative procedure. And consistent with the standard of care in a way I'm sure the doctor was trying to protect the intestines by packing it away and keeping it from — coming out there where the incision, or perhaps holding it in place, where a retractor like this, you have things covered up. You are trying to sew the layers back together. Where you're trying to place the retention sutures, that were placed in this case to protect the abdomen from splitting open. After the surgery had been completed, after — when you are placing those kind of stitches, you have to protect the gut from being penetrated by the needle and you cover with a lap pad, put something like that on top of it. You can sew on top of that instead of sticking the intestines with the needle. That's how I knew something like this could have easily happened."
R.T. at 532-33. Before the witness gave that testimony, the following had occurred:
 "Q. Dr. Bussey, . . . we've had a few boxes brought in, and, if you would, let's show this to the jury. Is there . . . information that you found in the records and X-rays, and in the CT scan, that support your opinion as to when . . . the sponge was left in?
 "A. Yes, sir. There are a number of things in the record along with the X-rays and the CT scan that support my opinion as to when the sponge was put inside — the lap.
 "Q. . . . [L]et's look first and see — let's do this in half and let the jury see the first one.
". . . .
 "A. . . . And the mass persists at various levels until you get down to the pelvis. And you can tell this is the pelvis because you can see the back of her hip bones, basically showing up on the side of the vertebral column. And on back down, you can finally begin to see this mass as you get down into the upper part of the pelvis area, the [part] that is most important regarding when this sponge would [have] been put in there, in terms of this position up through — up near the front of the abdominal wall right underneath peritoneum and the abdominal musculature. And there is literally nothing between the mass and front of the abdomen, several of these cuts, no intestinal loops, no other organal structure between this mass or this lap pad inside. And the front of the abdominal wall. *Page 222 
 "Q. Now, if this lap pad was put in, when it was packing away the bowel, when would it show up on the CT scan?
 "A. It can show up in a lot of different areas, depending on where you pack it. But considering the normal course of events, where you are packing away bowel and trying to get the bowel out of the way so it does not fall back into the pelvis and obstruct the area where the cyst is being removed, you expect to be — at least beside or underneath the bowel and covered over by the greater omentum that hangs down from the stomach and covers up all of the intestines. And you wouldn't really expect it to be right under the peritoneal covering at the top of the edge of the abdominal cavity, in my opinion, particularly based on the operative records which rather specifically say that the small bowel and the large bowel, after everything was cleaned up and placed back where it belonged, under the abdominal position. The operative reports state — and if you do that and wash everything out and put the guts back where they belong and cover it up with the other contents and fat, which is also specifically stated in the postoperative record. Then I would expect that you would see the lap pad, number one and remove it and then it certainly would be — if you did not remove it it would be underneath the structure that you put back there normally, an anatomical position, rather than sitting up on the top of them right underneath the anterior abdominal wall as it appears to be in this CT scan."
R.T. at 528, 530-31. After giving his opinion as to when the lap pad was placed into the body cavity, the witness testified:
 "Q. Let me ask you a question before you get into the pathologist's report. Let me just ask you to assume this: Assume that that is not right, that that is not how it happened. Instead it was packed away under the bowel like Dr. Ravi has indicated. Could this have migrated or have come up to the surface in this area over a course of a number of months, in your opinion?
 "A. I think it is highly unlikely because this is not a very smooth surface. And your body tends to wall off anything, whether it is a splinter under the skin or a mammary implanted in the breast or a sponge like this inside of the abdominal cavity. The first thing that happened is that it loops the bowel or at minimum just lays against. (inaudible) And it sticks to everything around it and forms a wall around it as you can see in these X-rays. And it does not take months for that to happen. It sticks to something immediately and within the next day or two will be stuck to it so much that you would have a hard time pulling it loose."
R.T. at 542-43.
 "The general rule is that '[h]ypothetical questions are correctly presented to expert witnesses if they are based on facts already in evidence or on facts that can be reasonably inferred from the facts in evidence.' Winton v. State, 563 So.2d 22, 24 (Ala.Cr.App. 1990). See also Pate v. State, 512 So.2d 138 (Ala.Cr.App. 1980); C. Gamble, McElroy's Alabama Evidence § 130.01 (4th ed. 1991).
 "The Alabama Supreme Court in Hollis v. Scott, 516 So.2d 576, 580 (Ala. 1987), held that 'a properly qualified expert witness may base his opinion upon either facts of which he has firsthand knowledge, or facts in evidence that are assumed in a hypothetical question asked of him.' Hollis.
(Emphasis added [in Maxwell].) 'Of course, it must be shown that the witness has sufficient knowledge of the facts to enable him to form an opinion, and he must testify as to the facts in his own knowledge upon which his opinion is based.' Hollis."
Maxwell v. State, 620 So.2d 93, 98 (Ala.Cr.App. 1992). In this case, the expert based his opinion on the position of the lap pad when it was removed from Coates's body cavity and *Page 223 
on the various medical charts and records that he had reviewed, all of which were in evidence when he testified.
Dr. Ravi also contends that the trial court erred in denying his motion for a new trial; as the basis for a new trial, he contended that some the jurors were given information from an extraneous source regarding a verdict against Dr. Ravi in a previous sponge case. During the hearing on the motion for new trial, several of the jurors were called to testify and each stated that during deliberations they heard a reference to a previous case against Dr. Ravi. Some of the jurors stated that they had heard the information from one of the defendants' attorneys. Each juror, however, stated that that reference did not affect the verdict rendered against Dr. Ravi. There was no error.
Following the trial, the judge granted the hospital's motion to reduce the judgment against it to $100,000 pursuant to §11-93-2, Ala. Code 1975, but denied the motion to do likewise for the employees of the hospital, Cathy Foxworthy and Wilma Vaughn. The final issue is whether the trial court erred in refusing to reduce the judgment against the nurses. Section §11-93-2 states:
 "The recovery of damages under any judgment against a governmental entity shall be limited to $100,000.00 for bodily injury or death for one person in any single occurrence. Recovery of damages under any judgment or judgments against a governmental entity shall be limited to $300,000.00 in the aggregate where more than two persons have claims or judgments on account of bodily injury or death arising out of any single occurrence. Recovery of damages under any judgment against a governmental entity shall be limited to $100,000.00 for damage or loss of property arising out of any single occurrence. No governmental entity shall settle or compromise any claim for bodily injury, death or property damage in excess of the amounts hereinabove set forth."
(Emphasis added.) Coates does not contest the reduction of the verdict against Athens-Limestone Hospital to $100,000; the nurses, however, contend that the statute mandates a reduction of the verdict against them.
The statute states that the cap applies to a governmentalentity. A "governmental entity" is defined as:
 "Any incorporated municipality, any county and any department, agency, board or commission of any municipality or county, municipal or county public corporations and any such instrumentality or instrumentalities acting jointly. 'Governmental entity' shall also include county public school boards, municipal public school boards and city-county school boards when such boards do not operate as functions of the State of Alabama. 'Governmental entity' shall also mean county or city hospital boards when such boards are instrumentalities of the municipality or county or organized pursuant to authority from a municipality or county."
Section 11-93-1(1), Ala. Code 1975. Immediately thereafter, § 11-93-1(2) defines "employee":
 "An officer, official, employee or servant of a governmental entity, including elected or appointed officials, and persons acting on behalf of any governmental entity in any official capacity, temporarily or permanently, in the service of the governmental entity, whether with or without compensation, but the term 'employee' shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the governmental entity to which this chapter applies in the event of a claim."
The Legislature could easily have made certain that the $100,000 cap was applicable to "employees" of "governmental entities," but it did not do so. "Unprotected joint tort-feasors are not entitled to the statutory protection against the judgment creditor's right to recover in excess of $100,000." Elmore County Commission v. Ragona, 540 So.2d 720,728 (Ala. 1989) (Jones, J., concurring specially). Thus, because § 11-93-2 does not apply to the employees of a governmental entity, the court properly refused to reduce the judgment against nurses Foxworthy and Vaughn. *Page 224 
The judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, and KENNEDY, JJ., concur.