888 So.2d 1208 (2003)
Charles W. BREAUX, M.D., and Jefferson Clinic, P.C.
v.
Sheila Bailey THURSTON.
1011655.
Supreme Court of Alabama.
December 30, 2003.
Rehearing Denied March 26, 2004.
*1209 Randal H. Sellers and Sybil Vogtle Abbot of Starnes & Atchison, LLP, Birmingham, for appellants.
John W. Haley, Shay Samples, and Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham, for appellee.
*1210 HARWOOD, Justice.
Sheila Bailey Thurston filed a medical-malpractice action against Dr. Charles W. Breaux and Jefferson Clinic, P.C., a professional corporation through which a group of doctors, including Dr. Breaux, provided physicians for the staff of Cooper Green Hospital. The case was originally tried before a jury on October 18, 1999, against Dr. Breaux, the Jefferson Clinic, P.C., Cooper Green Hospital, and two surgical nurses, Cynthia Venton and Wylie King. The jury returned a $78,000 verdict against the defendants, but the trial judge, realizing he had committed an error, subsequently ordered a new trial. The defendants appealed, various ones asserting different objections to the grant of a new trial, either on jurisdictional grounds or because different relief was not granted. This Court affirmed the grant of a new trial. Breaux v. Bailey, 789 So.2d 204 (Ala.2000). When the case was retried on February 19, 2002, only Dr. Breaux and the Jefferson Clinic remained as defendants, Cooper Green Hospital, Venton, and King having settled the claims against them for a total of $100,000. The jury returned a verdict against Dr. Breaux and the Jefferson Clinic in the amount of $300,000. The trial court entered a judgment on the verdict and later denied the defendants' postjudgment motions for a judgment as a matter of law, a new trial, or a remittitur. Dr. Breaux and the Jefferson Clinic again appealed. We reverse and remand.
Ms. Thurston consulted Dr. Breaux in 1994 regarding weight-loss surgery. Dr. Breaux, a board-certified general surgeon and a professor at the University of Alabama at Birmingham, had many years of experience in bariatric surgery, performed to treat obesity. Ms. Thurston had a number of health problems that were compounded by her obesity. She decided to undergo a bariatric procedure known as gastric bypass. When she first consulted Dr. Breaux she weighed 283 pounds. When the bypass surgery was performed at Cooper Green Hospital a little more than eight months later, on December 21, 1994, she weighed 310 pounds. The surgical incision into Ms. Thurston's abdomen, when "opened up" by the use of retractors, created an opening approximately 8 to 10 inches wide and 10 inches long. The ensuing operation lasted two hours or slightly longer. Testimony presented at trial detailed the step-by-step features of the operation, but they are not relevant to the issues on appeal. In essence, the surgery rerouted portions of Ms. Thurston's intestines to shorten the length available for digestion and absorption, significantly reduced the size of her stomach, and reconnected her stomach to the intestine by a small opening. Dr. Breaux was assisted by Dr. Harris,[1] a third-year resident at Cooper Green Hospital, registered nurse Cynthia Venton, functioning as the circulating nurse, and Wylie King, functioning as the scrub nurse or operating-room technician. The hospital's "Operating Room Policies and Procedures" provided, with respect to "Instrument Count," that "[t]he purpose of an instrument count is to prevent the possibility of any foreign object being left in a body cavity." With respect to the safeguards to be employed to accomplish that purpose, the Operating Room Policies and Procedures prescribed the following procedure:
"1. All instruments are counted by [the operating-room technician] and circulating [registered nurse] together prior to operative procedure. Procedure is to count individually each ringed instrument, retractor, tissue forcep, suction, *1211 and knife handle, and record each count on count sheet.
"2. Each additional instrument given the [operating-room technician] during the procedure will be added to the count sheet.
"3. When the peritoneum is being closed, the instruments are again counted: the final count must equal the count prior to operative procedures plus the instruments added during the procedure. Instruments are to be counted by the [operating-room technician] and [a registered nurse] together in the following manner:
"a. Count ring instruments first. Start at back table and work towards sterile field counting each group before proceeding on.
*Instruments are strung up as they are listed on count sheet to facilitate counting.
"b. Count all retractors, tissue forceps, suctions, and knife handles.
"c. Count all special trays (total numbers).
"4. If count is unresolved  recount together in same order.
"5. Unresolved Count:
"a. The [operating-room technician] and circulating [registered nurse] determine which type of instrument is not accounted for and continue to look for instrument.
"b. Notify the surgeon of unresolved count.
"c. Notify Head Nurse.
"d. X-ray is ordered prior to moving patient from operating table.
"e. [The registered nurse] documents the following in nurses notes on circulating sheet:
"1. that count was unresolved
"2. that surgeon is notified
"3. whether or not X-ray was taken
"4. results of X-ray
"5. if count is resolved after X-ray
"6. if body cavity had to be re-opened
"7. any other pertinent information regarding initial unresolved count
"f. Incident report is filled out as needed by [registered nurse] at the end of procedure and given to Head Nurse."
No one contends that Venton and King did not perform the required instrument count immediately before Ms. Thurston's surgery. Dr. Breaux testified that when such a preoperative count is performed, he often has not yet entered the operating room and is in some other part of the hospital attending to other duties or patients. It is undisputed that at the end of the operation, but before Dr. Breaux closed the abdominal incision, Venton and King jointly conducted the required postoperative count and reported to Dr. Breaux that it was "correct," meaning that the postoperative count of each category of surgical instruments matched exactly the preoperative count. Dr. Breaux testified that he did not participate in the counts and that "[t]he nurses actually don't want any interference when they are counting, so that they are not distracted and don't lose count of what they are doing." Dr. Breaux further explained that a surgeon does not make any attempt to count the instruments placed in a patient and then removed, because of the need to concentrate on the performance of the surgical procedure. Before receiving the "correct" postoperative count from the nurses, Dr. Breaux visually inspected that portion of the abdominal cavity then viewable through the surgical opening and saw no *1212 evidence of a retained object.[2] After that initial inspection, Dr. Harris used a handheld retractor to successively elevate various portions of the abdominal wall while Dr. Breaux looked and felt within the four abdominal quadrants thus exposed. In the process of "feeling," he pushed down on the various abdominal structures underneath his hand, while pouring in saline solution to irrigate the space created. "[W]hile I'm pressing, I'm feeling and, of course, I'm feeling on the surface of this mesentery, which is a thick omentum which is a thick layer which overrides everything and if I feel anything, then I can pull things aside and then feel with my finger tips." After looking and feeling within each of the four abdominal quadrants, Dr. Breaux switched from saline solution to antibiotic solution and repeated, in reverse order, the exact procedure of pressing and feeling within each of the four quadrants.
Having completed all of those inspections and having received a "correct" count from Venton and King, Dr. Breaux "closed up," and Ms. Thurston was taken to the recovery room.
Ms. Thurston did well and lost weight. She moved to Nevada. During the late winter of 1996, she started having pain on her left side. She consulted Dr. Lynn Greenhouse, a physician in Nevada specializing in internal medicine. The X-ray films from a barium enema Dr. Greenhouse ordered revealed "right in the middle of the large intestine ... a Babcock-type surgical clamp." Dr. Greenhouse referred Ms. Thurston to Dr. Myron J. Gomez, a general surgeon in Nevada, for removal of the clamp. During that surgery, Dr. Gomez found that the clamp had eroded into the small bowel; he removed the clamp and repaired the bowel. Both Dr. Greenhouse and Dr. Gomez were deposed, and portions of their depositions were read to the jury at trial.
Ms. Thurston testified at trial concerning the various problems she experienced following the clamp-removal surgery, but a discussion of those problems is unnecessary, other than to say there was ample evidence from which the jury could conclude that Ms. Thurston had suffered significant injury.
Neither Dr. Greenhouse nor Dr. Gomez testified during their depositions concerning the medical standard of care that should apply to abdominal surgery.
As amended, the complaint named as defendants not only Dr. Breaux and Jefferson Clinic, but also Cooper Green Hospital, Venton, and King. The claims asserted against Dr. Breaux were that he had negligently or wantonly failed to remove all foreign objects, that he had failed to determine that all foreign objects had been removed before completing the surgical procedure, that he had failed after the surgery to discovery the presence of a retained foreign object, and the he had failed to properly supervise the nurses. The claim against Jefferson Clinic was purely derivative of the claims against Dr. Breaux. Cooper Green Hospital, Venton, and King settled the claims against them for a total of $100,000, and the case proceeded to trial against only Dr. Breaux and Jefferson Clinic. The only testimony presented at trial concerning the applicable medical standard of care, and whether it had been breached, came from Dr. Breaux and Dr. Edward Waites, a general surgeon from Atlanta presented by Dr. Breaux. Dr. Waites had entered medical *1213 practice in 1960 and had begun doing gastric-bypass surgery in 1984. By the time of trial, that procedure constituted 85 percent of his surgical practice and he estimated that he had performed gastric-bypass surgery 800 or 900 times.
The trial judge correctly instructed the jury that the case arose out of the Alabama Medical Liability Act of 1987, § 6-5-540 et seq., Ala.Code 1975 ("the 1987 Act"). The 1987 Act expressly provides that it is intended to supplement, and be construed so as to be consistent with, the Alabama Medical Liability Act enacted in 1975 and codified at § 6-5-480 et seq. ("the 1975 Act"). Section 6-5-481(9), a part of the 1975 Act, defines "medical liability" as a finding that a health-care provider did not meet the applicable standard of care, and that such failure was the proximate cause of the injury complained of. Section 6-5-484(a) declares that "[i]n performing professional services for a patient, a ... surgeon's ... duty to the patient shall be to exercise such reasonable care, diligence and skill as ... surgeons ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." Section 6-5-542(2), a part of the 1987 Act, parallels and expands the language of the 1975 Act, stating that "[t]he standard of care is that level of such reasonable care, skill, and diligence as to other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases," and explaining that "[a] breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death." Section 6-5-548(a) of the 1987 Act provides that in a medical-malpractice action, "the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in any like case." Subsection (e) declares that the purpose of that section is "to establish a relative standard of care for health care providers." Section 6-5-484(b) declares that no surgeon "shall be considered an insurer of the successful issue of treatment or service." As explained in Sewell v. Internal Medicine & Endocrine Associates, P.C., 600 So.2d 242, 244 (Ala.1992):
"The statutory standard of care to be considered in medical malpractice actions also contemplates that the jury should focus on the circumstances surrounding the defendant's conduct, rather than on the outcome, when determining whether the defendant's conduct was negligent. Ala.Code 1975, § 6-5-484(a). To hold otherwise would be to hold that a defendant doctor is the insurer of satisfactory results of medical treatment, and such a result is expressly prohibited by § 6-5-484(b)."
Section 6-5-549 was amended in 1996 to provide:
"In the case of a jury trial, the jury shall be instructed that in order to return a verdict against a health care provider, the jury must be reasonably satisfied by substantial evidence that the health care provider failed to comply with the standard of care and that such failure probably caused the injury or death in question."
The dispositive issue on this appeal is whether the trial judge properly conveyed those concepts to the jury in his jury instruction.
The parties focus on the opinions of this Court in Powell v. Mullins, 479 So.2d 1119 (Ala.1985); Ravi v. Williams, 536 So.2d 1374 (Ala.1988)("Ravi I"); Northeast Alabama *1214 Reg'l Med. Ctr. v. Robinson, 548 So.2d 439 (Ala.1989); and Ravi v. Coates, 662 So.2d 218 (Ala.1995)("Ravi II").
In Powell, a case in which a surgeon left an 18-inch-square "surgical lap sponge" in the plaintiff, the issue was whether the plaintiff was required to present expert testimony as to the medical standard of care and its breach. The trial judge directed a verdict for the defendant physician because of the absence of such testimony. This Court held that the plaintiff should have been allowed to proceed without expert medical testimony because the circumstances fell within the exception to the rule requiring expert testimony to establish what is or is not proper medical care and procedure, i.e., the exception that no such testimony is required when "an understanding of the doctor's alleged lack of due care or skill requires only common knowledge or experience." 479 So.2d at 1120. "Under our cases, a failure to remove sponges, needles, etc., which are placed inside the patient during the operation constitutes prima facie evidence of negligence." 479 So.2d at 1126. Thus, the Court disposed of the issue it had characterized as the "only issue presented by this case." 479 So.2d at 1120.
Nonetheless, the Court went further and stated that "`[a] surgeon undertaking to perform an operation requiring the placing of sponges in the incision does not complete his undertaking until the sponges are properly removed....'" 479 So.2d at 1126 (quoting 61 Am.Jur.2d Physicians and Surgeons, etc., § 258 (1981)). The Court opined that the "mere fact" that a surgeon delegated the task of counting removed sponges to the assisting nurses would not relieve the surgeon of his or her responsibility to remove the sponges in the first place and that "[t]he nurses' responsibility of counting them afterward amounts to only an added precaution taken by the defendant to help insure that he had properly performed his duty." 479 So.2d at 1126. The Court also stated that "`the inference arising from res ipsa loquitur is not refuted by the assertion that the nurse's sponge count was reported as in order....'" 479 So.2d at 1126 (quoting 61 Am.Jur.2d Physicians and Surgeons, etc., § 258 at 399 (1981)). Finally, the Powell Court "adopt[ed] the reasoning" of two Louisiana decisions holding that a surgeon's failure to remove a sponge before closing an incision "`may be regarded as negligence per se,'" and the fact that the surgeon "`had complied with the "community standard" in relying on the nurse's sponge count did not exonerate'" the surgeon. 479 So.2d at 1126-27 (quoting Guilbeau v. St. Paul Fire & Marine Ins. Co., 325 So.2d 395, 398 (La.Ct.App.1975)). Arguably, the Powell Court's approval of these propositions is dictum, because Powell was resolved on the basis of the applicability of "the exception."[3] The Powell Court, however, also quoted Sellers v. Noah, 209 Ala. 103, 95 So. 167 (1923), and Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969), in recognition of the principle that when a surgeon leaves a foreign substance in a patient's body the surgeon has the burden of proof in "going forward with a defense" to attempt "'"to show that he exercised the stated reasonable and ordinary care, skill, and diligence in respect of the operation upon his subject, including the process of closing the wound."'" 479 So.2d at 1121 (quoting Parrish, 284 Ala. at 267, 224 So.2d at 624).
In Ravi I, Dr. P.B. Ravi performed a hysterectomy on a patient. After one of *1215 the attending nurses informed him that all surgical sponges had been accounted for, he completed the operation. It was later learned that a surgical sponge had been left in the plaintiff's abdomen. Appealing from an adverse verdict in the patient's ensuing medical-malpractice action, Dr. Ravi contended that the trial court had erred in charging the jury as follows:
"`Now, ladies and gentlemen, the next [issue] that they raised in [order] has to do with the sponges. I'm going to give you a written charge in a few minutes about that, but as I understand the law in the State of Alabama, there is no issue. The Supreme Court of this State says it is the doctor's responsibility to ensure that the sponges that are used are not retained when the abdominal cavity or cavity is closed, so I am going to charge you as a matter of law that that is prima facie evidence of a negligent or negligence by a physician or surgeon in carrying out those duties and falls beneath the standard of care. Now, that doesn't necessarily follow, but that means that you would automatically make an award because there is other findings. Again, you've got to find the fact that the sponge was there, and that as a direct and proximate consequence of that she has suffered injuries and damages for which she is entitled to recover monetary damages.'"
536 So.2d at 1375-76.
Dr. Ravi objected to the statement in the charge that "there is no issue," asserting that expert testimony had been presented to the effect that "failure to remove all sponges after a search and after receiving information from a nurse that the sponge count was correct does not fall below the standard of care." 536 So.2d at 1376. The Ravi I Court quoted extensively from Powell, supra, including its somewhat inconsistent statements that a surgeon's failure to remove foreign objects "constitutes prima facie evidence of negligence," and that a surgeon's failure to remove a sponge "constituted negligence per se." The Court summarily stated its conclusion: "Considering the entirety of the court's charge to the jury, we hold that it was not so incorrect or confusing as to constitute reversible error." 536 So.2d at 1376.
The following year, in Northeast Alabama Regional Medical Center v. Robinson, supra, this Court addressed the same circumstances it had before it in Ravi I: a surgeon left a surgical sponge in his patient after performing a hysterectomy. The circulating nurse had advised the surgeon that the postoperative sponge count was correct. At trial, the medical expert witnesses all agreed that it was within the standard of care for a surgeon to rely on a nurse's sponge count to confirm that no foreign objects had been retained in the surgical site. Following a verdict for the surgeon, the trial court ordered a new trial, which, for purposes of the later appeal, was presumed to have been based on the ground that the verdict was against the great preponderance of the evidence. This Court, citing Powell, noted that although expert testimony was "not required in a sponge case to establish the proper medical treatment and procedure," expert testimony had been presented at the trial of the case and the Court had "recently held that such testimony presents an issue of fact to be decided by the jury," citing Riase v. Wood, 540 So.2d 646 (Ala.1988). 548 So.2d at 441. The Court explained that Riase had distinguished its facts from those in Powell. Specifically, because of the presence of expert testimony in Riase regarding the standard of care, "`the jury was entitled to consider and believe either side's evidence.'" Robinson, 548 So.2d at 441 (quoting Riase, 540 So.2d at 648).
*1216 The Robinson Court noted that the applicable standard for review of an order granting a new trial was that such an order would be reversed on the basis that the trial court had exceeded its discretion when "it is easily perceivable from the record that the jury verdict is supported by the evidence." 548 So.2d at 441 (emphasis omitted). This Court concluded that, given the expert testimony presented, it was "easily perceivable from the record that the jury's verdict in favor of [the defendant surgeon was] supported by the evidence" and, thus, it was error for the trial court to grant a new trial. Four of the five Justices who had participated in Ravi I joined in the unanimous seven-Justice opinion,[4] but Ravi I was never mentioned.
At the very least, Robinson stands for the proposition that in a retention case, when undisputed medical testimony is presented that the standard of care was met despite the retention, the jury is "entitled to consider and believe either side's evidence." 548 So.2d at 441.
In Ravi II, a surgical sponge had been left inside a patient who had undergone surgical removal of an ovarian cyst. There was a dispute at trial as to whether, as the surgeon asserted, there had been a miscount by the two nurses who assisted at the surgery or whether, as the nurses contended, the surgeon "had taken one of the lap pads for further use after the final count of the pads had been made." 662 So.2d at 219. As in the present case, the patient sued the surgeon, the hospital, and the two assisting nurses. The jury returned a verdict against all of the defendants. On appeal, the defendants argued that the trial court had erred to reversal in giving the following portion of the jury charge:
"`The standard of care to be applied in regard to sponges that are left inside a patient after surgery is that the physician who conducted the surgery bears the responsibility of removing the sponges from the patient's body and cannot by delegating the task of counting relieve himself from the liability of injury to the patient caused by leaving a sponge in the body. [The] fact that all physicians engaged in practice within the defendant's same general neighborhood routinely delegate the task of accounting for surgical sponges and relying on counts given them by other nurses or assistants, does not in itself relieve the physician of the liability for sponges left inside the patient's body.'"
662 So.2d at 219. The Court noted that the charge was practically directly quoted from Ravi I.
The Ravi II Court went on to say that "Powell stands for the proposition that evidence that a sponge was left inside a patient's cavity is prima facie evidence of negligence. Upon plaintiff's presentation of such evidence, the burden shifts to the defendant to show that there was no negligence." 662 So.2d at 220. With respect to the surgeon's contention in Ravi II that the jury charge led the jurors to believe that he was guilty of negligence per se, the Court disagreed, explaining that almost immediately before giving the instruction complained of by the surgeon, the judge had told the jury:
"`Further, if you find from substantial evidence of the truthfulness of plaintiff's claim that the defendant [surgeon] left a sponge inside her and sewed her up leaving a sponge inside, that is prima facie evidence of breach of standard care that is required by the defendant [surgeon]. In this case the burden would *1217 shift to the defendant [surgeon] to reasonably satisfy you from the evidence that he did not breach the standard of care required by him.'"
662 So.2d at 220. The Court concluded that the trial judge had correctly stated the applicable law in telling the jury that the fact that a surgeon delegates the responsibility of counting sponges to his nurse "does not in itself relieve the physician of the liability." 662 So.2d at 221. That wording, which contains the qualifying phrase "in itself," differs significantly from the statement that such a delegation of sponge count would not relieve a surgeon "in any way" from liability. Ravi I, 536 So.2d at 1376. There is no discussion in Ravi II of what, if any, expert testimony was introduced concerning the standard of care and there is no indication that the surgeon had undertaken to explore visually and manually for the possibility of a retained sponge, as opposed to simply relying on the nurses' count. Ravi II makes no reference to Robinson.
The holdings of these cases may be summarized and harmonized as follows: Although it is the responsibility of a surgeon to remove before closing the incision all foreign objects due to be removed, the critical issue to be put to the jury is whether the surgeon conformed to the standard of care in attempting to fulfill that responsibility. The presence of the retained object is prima facie evidence of negligence by the surgeon in carrying out that responsibility. The presence of the retained objected does not, however, establish negligence per se. Rather, it serves to shift the burden to the defendant surgeon to show that he or she was not negligent because he or she fully complied with the statutorily defined standard of care. The fact that the operating-room nurses responsible for counting objects before and after the surgery report a final "correct" count does not in itself relieve the surgeon of liability. Rather, for a jury question to be presented, there must be expert testimony establishing the medical standard of care for attempting to prevent the retention of foreign objects in the body after surgery. To the extent that the surgeon relied on the nurses' counts, there must be expert testimony establishing that such a practice is within the standard of care. If, after the plaintiff offers prima facie evidence of negligence by a showing that a foreign object was retained in the body after surgery and the burden of proof shifts to the surgeon, the standard of care is clearly established by expert testimony and there is substantial evidence indicating that the surgeon complied with all components of that standard of care, a jury question is presented as to whether the surgeon was in fact negligent.
At trial, Dr. Breaux acknowledged that he had clamped the Babcock clamp to a small piece of bowel during the course of repairing a "rent," in order to try to prevent a hernia. He testified that he had done approximately 340 gastric-bypass procedures and that he had never left a clamp in any of his other patients. Dr. Breaux expressed his belief that the reason he had not found the clamp while he was looking and feeling in the abdominal cavity was that "I think the clamp had moved into a position underneath several loops of bowel and underneath the omentum, ... which is a big sheet of fatty tissue that covers all of the intestine and adds additional inch and three-quarters to one inch of tissue that you have to palpate or touch through in order to feel," so that he could not feel the clamp. Dr. Breaux testified that leaving an instrument inside a patient's body would not be acceptable if the surgeon had not followed the standard of care of "seeing and feeling for foreign bodies" and had not received a "correct" nurses' count; he testified, however, that *1218 there are occasions when an instrument may be left despite adherence to "all the proper steps" of the standard of care.
Dr. Breaux acknowledged that at the end of the operative procedure it was his responsibility, in compliance with two of the components of the standard of care, to both look and feel for any retained foreign objects. He stated that he in fact did so. He testified that there was a "third component of the standard of care," relating to the nurses' count of the instruments. He explained that it was a part of the standard of care for a surgeon to rely on nurses to perform the count accurately. He stated that he did not rely solely on the count, but rather relied on it in conjunction with the other two steps in the standard of care  visualization and palpation.
Dr. Breaux acknowledged that the clamp was ultimately found in an area in which the standard of care required that he place his hands for careful feeling, but he expressed the opinion that "over the period of sixteen months between the operation and the time it was felt, ... the clamp actually moved into [that] position" by virtue of peristalsis and the weight of the clamp.
Dr. Waites explained the applicable standard of care as follows:
"[T]he standard of care requires that you do the usual visual, feel, look, and number two, search by palpating with your fingers. And then number three, that you rely on the sponge, lap and instrument count that the nurses do. In this particular field, we rely much more on the count than the other two, because of the size of the patient and the depth of the patient's abdomen. I think I could liken it to, some of you are familiar with old tin washtubs, galvanized washtubs that are about three feet across and about so deep.... If you could cover that with a heavy quilt and put an eight to ten inch incision on it and fill it with, say some wet noodles all inside, and you've got that little eight inch or ten inch incision to reach through and palpate, it's a much more difficult job to palpate accurately throughout the abdomen, all four quadrants, on someone of that size and depth than it would be, say, a slender person who did not have that size of an abdomen. So, to specify the emphasis, I'd say it would be more the nurses' count, the correctness of that count, than what I can feel."
Dr. Waites testified that, based on Dr. Breaux's description of what he had done in visually and manually exploring for any retained objects and then relying on the nurses' count, Dr. Breaux had met the standard of care.
Both Dr. Breaux and Dr. Waites testified that if a surgeon were to explore more extensively and more aggressively for retained objects than had Dr. Breaux, there would be a substantial risk of disruption of the surgical connections, damage to the internal organs, and infection. Dr. Breaux testified that such occurrences would be "catastrophic." He also testified that an extensive exploration could create hemorrhage by disrupting blood vessels, which would be "disastrous." Additionally, there would be the risk of stimulation of "adhesions" from irritation.
Dr. Waites testified that the retention of the Babcock clamp should not have happened, because it should have been picked up on the instrument count, and that although instruments "are left in frequently," in 99 percent of the cases, based on a reported "incorrect" count, they are picked up on a re-exploration or by X-ray. As noted, those are among the procedures prescribed by the Cooper Green policy when a discrepancy between a preoperative count and a postoperative count is not *1219 otherwise resolved. Dr. Waites testified that, pursuant to the standard of care, a doctor completes his undertaking to the patient if he has properly looked for retained objects, has properly felt for them, and has gotten a "correct" instrument count. "In other words, he has not completed his procedure to the point that he can sew her up if he has not gotten a correct instrument count." When asked, obviously in anticipation of the jury charge to the effect that a nurse's responsibility of counting "amounts only to an added precaution," whether in fact "[t]he nurses' responsibility of counting instruments after surgery amounts only to an added precaution," Dr. Waites testified that such a statement "underestimates the importance of what the nurses do, particularly in obese patients." He stated that in bariatric surgical patients, the nurses count is probably "number one" in importance, because of the patient's girth and size. Accordingly, he said, under the standard of care, the nurses' count is "much more than an added precaution." Dr. Waites further testified that once a surgeon had properly "looked, felt, and asked for a correct count," and has been advised that the count is correct, the surgeon "absolutely" has "completed his responsibility to the patient there on the operating table."
The trial judge charged the jury, in pertinent part, as follows:
"Plaintiff further claims that the defendant breached the standard of care required of him, and further claims that she was probably injured as a proximate result of the alleged breach of the standard of care.
"Now, there are some terms that I'm going to define for you. But first, I'll tell you this, that the defendant denies the claims of the plaintiff. Therefore, the burden is upon the plaintiff to reasonably satisfy you, by substantial evidence, of the truthfulness of all the elements of her claim before she will be entitled to recover.
"I've used the term `substantial evidence.' Substantial evidence means that character of admissible evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.
"I've used the term `standard of care,' and I want to define that for you. The standard of care of a surgeon is that level of such reasonable skill, diligence and care as other similarly situated surgeons in the same general line of practice ordinarily have and exercise in like cases. A breach of the standard of care is the failure by a surgeon to comply with the standard of care, which failure probably causes personal injury.
"....
"This particular case is known as a retention case, and I want to give you the duty of a surgeon in a retention case. A surgeon, undertaking to perform an operation requiring the placement of instruments or other foreign objects in the incision does not complete his undertaking until those instruments and other foreign objects are properly removed so that under the law of Alabama, the failure to remove instruments or other foreign objects which are placed inside the patient during the operation constitutes prima facie evidence of negligence on behalf of the surgeon.
"The responsibility to remove instruments or other foreign objects is that of the doctor and not that of the nurses or assistants assisting him. The mere fact that the surgeon delegated the task of counting the instruments and other foreign objects once he had removed them from the patient, does not by itself relieve the surgeon of his responsibility to remove them in the first instance because *1220 the surgeon has the duty and responsibility for removing all instruments and other foreign objects from the patient's body in the first instance. The nurses' responsibility of counting the surgical instruments after surgery amounts only to an added precaution taken by the defendant to help ensure that he had properly performed his duty to remove the instrument from the patient.
"The disputed issues of fact to be decided by you in this case are whether the defendant breached the standard of care for health care providers in the same general neighborhood, and if there was a breach of that standard, did the breach proximately cause the plaintiff's damages. The burden is upon the plaintiff to reasonably satisfy you, by the evidence, of the truthfulness of the matters and things claimed by her before the plaintiff will be entitled to recovery.
"I've used the term `the same general neighborhood.' I want to tell you what that means. The same general neighborhood means the national medical neighborhood of reasonably competent physicians in the same line of practice acting in the same or general circumstances.
"With regard to Defendant Dr. Breaux, if you are reasonably satisfied by substantial evidence of the truthfulness of plaintiff's claim that Dr. Breaux, in performing this operation, left in the body of the plaintiff, after closing the wound, a foreign object, in this case a Babcock clamp, then the law casts upon the defendant, Dr. Breaux, the burden to reasonably satisfy you by substantial evidence that he used such reasonable and ordinary skill, care and diligence as physicians and surgeons in the same general neighborhood and in the same general practice ordinarily used and exercised in such operations, including the process of closing the surgical wound.
"....
"If after a full and fair consideration of all the evidence, you are not reasonably satisfied by substantial evidence of the truthfulness of each element of the plaintiff's claim, then your verdict would be for the defendant. And your deliberations would come to an end at that point.
"If, on the other hand, after a full and fair consideration of all the evidence, you are reasonably satisfied by substantial evidence of the truthfulness of each element of the plaintiff's claim, then your verdict should be for the plaintiff. In that event, it will be necessary for you to arrive at an amount to be awarded in the verdict form, which I'll read to you and describe to you later in my charge...."
Counsel for Dr. Breaux objected on various grounds to the following portions of the charge, and, in some instances, requested clarifying charges. Counsel objected to the court's refusal to give his written requested charge, which explained that although the plaintiff's showing the surgical instrument was retained shifted to Dr. Breaux the burden to show that there was no negligence on his part, if he reasonably satisfied the jury that he had acted consistent with the standard of care, it could not return a verdict against him and Jefferson Clinic; defense counsel argued that the charge as constituted could lead to some confusion on the part of the jury, and he requested that the court clarify matters by instructing that if after the burden of proof shifted Dr. Breaux had met that shifted burden by proving that he had met the standard of care, the verdict should be in his favor. He objected to the part of the charge stating that in "a retention case ... the duty of the surgeon" was *1221 to remove all instruments or other foreign objects and that the surgeon "does not complete his undertaking until those instruments and other foreign objects are properly removed so that ... the failure to remove" them constituted "prima facie evidence of negligence on behalf of the surgeon." Dr. Breaux's counsel pointed out that the statement in the charge that a surgeon "does not complete his undertaking" until all instruments are properly removed was confusing. Counsel requested that the court explain to the jury that under the concept of "prima facie negligence" the surgeon could still "rebut that and prove that he met the standard of care," with the result that the verdict should then be in his favor. Defense counsel further objected to the statement that the nurses' responsibility of counting the surgical instruments "amounts only to an added precaution taken by the defendant to help insure that he had properly performed his duty to remove the instrument from the patient." The objection was on the ground that such a statement was a comment on the evidence and was contrary to the principle of Alabama law that physicians do not ensure results. Finally, counsel pointed out that the verdict options in the charge were incomplete, given the burden-shifting process, because the jury had been told only that if it was not satisfied of the truthfulness of each element of the plaintiff's claim, it should find for the defendants, but that if it was reasonably satisfied of the truthfulness of each elements of the plaintiff's claim, it should find in her favor. Defense counsel pointed out that there was an alternative in the case, "[t]hat is, after the burden has shifted to Dr. Breaux, if Dr. Breaux has met his burden, then there must be a verdict for the defendant." In that regard, counsel requested the court to recharge the jury so as to tell it that "if after a full and fair consideration of the evidence they have determined that the burden shifted to Dr. Breaux, and Dr. Breaux has met the burden of proof that he acted within the standard of care in the circumstances, then the verdict should be for him."
The trial judge overruled all counsel's objections and declined to give any supplemental, explanatory charge.
In Shumaker v. Johnson, 571 So.2d 991 (Ala.1990), this Court, overturning a long line of cases, held that it was reversible error for the trial judge in a medical-malpractice case to charge the jury that "a physician is not liable for an honest mistake or an honest error of judgment, so long as he meets the required standard of care." 571 So.2d at 993. The Court's reasoning was that the charge should not have been given "because of its potential for confusing the jury." 571 So.2d at 994. Because the charge was "potentially confusing and therefore objectionable," the trial court had erred to reversal in giving it. 571 So.2d at 995. The Court emphasized the fact that "the legislature has codified the standard of care to be exercised by physicians in this state," citing § 6-5-484, Ala.Code 1975; that "[t]his statutory standard is clear and unambiguous"; and that "[t]he Code section clearly states an objective standard for the performance of professional duties by physicians." 571 So.2d at 993.
We recognize that our duty is to review the trial court's entire charge to determine if there is reversible error. Sewell, 600 So.2d at 244. We have done so in this case and find reversible error, because the combined effect of the charge as given, the refusal of the written requested charge, and the refusal of the orally requested explanatory charge had the "potential for confusing the jury." The judge charged the jury that "the duty of a surgeon *1222 in a retention case" was not completed until all instruments had been properly removed; the trial judge stated that a failure to remove an instrument constituted "prima facie evidence of negligence on behalf of the surgeon" and charged the jury that if Thurston satisfied them "of the truthfulness" of her "claim that Dr. Breaux left in her body a Babcock clamp," then "the law casts upon ... Dr. Breaux," the burden to prove that he had satisfied the standard of care; he then charged the jury that its only option was to determine whether the plaintiff had proven "the truthfulness" of her claim. The jury was told that the nurses' responsibility of counting the surgical instruments amounted "only" to an added precaution taken by Dr. Breaux, to ensure that he had properly performed "his duty to remove the instruments from patient." This, of course, referred to the trial judge's earlier instruction to the jury that "the duty of a surgeon in a retention case" was not completed until all instruments had been properly removed.
The trial judge never defined for the jury the concept of "prima facie evidence of negligence" and never discussed with it any way that Dr. Breaux could satisfy the burden "cast" upon him if the jury was satisfied of "the truthfulness of [Ms. Thurston's] claim that Dr. Breaux in performing this operation, left in [her] body ... a foreign object, in this case a Babcock clamp." As noted, the undisputed expert medical testimony was to the effect that a surgeon performing a gastric-bypass operation would fully fulfill and satisfy the applicable medical standard of care if he or she properly looked and felt for any retained foreign object and before closing received from the two nurses separately counting the instruments a report that the count was "correct." In the face of that testimony, the trial judge charged the jury that the nurses' count amounted "only to an added precaution." That particular language was not included in the jury charges discussed either in Ravi I or Ravi II; rather, it simply appears in the extended discussion, arguably dictum, in Powell, which was thereafter clearly limited by Robinson.
As there was in Robinson, there was in this case uncontradicted medical testimony; it established that Dr. Breaux had satisfied, rather than violated, the applicable medical standard of care in that he (1) had carefully looked for and (2) carefully felt for any retained foreign objects, and (3) had then received a report from the operating-room nurses that all surgical instruments used in the surgical procedure had been accounted for. Given that testimony, there was clearly the "potential for confusing the jury" in the instruction that the nurses' count amounted "only to an added precaution" by Dr. Breaux to "ensure that he had properly performed his duty to remove the instruments from the patient." Under the applicable standard of care, as established by uncontradicted expert medical testimony, the final instrument count by the nurses  and the surgeon's reliance on that count  was an important, if not the most important, component of the three-step procedure that constituted the standard of care. The court's charge denigrated that component to such an extent as to be a comment on the evidence and potentially to confuse the jury as to the role of a "correct" nurses' count in the standard of care.
Under our caselaw, proof of a retained surgical instrument, in the absence of expert medical testimony presented by the plaintiff, constitutes only prima facie evidence of negligence on the part of the surgeon. The effect of such prima facie evidence is to shift to the surgeon the *1223 burden of going forward with the evidence, to the end that the surgeon has the opportunity to overcome the prima facie evidence by establishing, through expert medical testimony, the elements of the applicable medical standard of care, and that he satisfied all of them. If no contradictory expert medical testimony is introduced, however, that prima facie evidence is sufficient to sustain a verdict against the surgeon. The jury instruction in this case, as duly objected to, and in the face of the expert testimony presented, clearly had the potential to confuse the jury.
That is not to say, of course, that Dr. Breaux was entitled to a judgment as a matter of law or that the jury was otherwise obliged to find in his favor. Rather, as explained in Robinson, supra, the testimony of Dr. Breaux and Dr. Waites "present[ed] an issue of fact to be decided by the jury," 548 So.2d at 441, and the jury was free "to consider and believe either side's evidence." Id. The charge in its entirety, as duly called to the trial judge's attention by objections and a request for explanatory charges, was sufficiently confusing so as to deprive the jury of that opportunity.
Accordingly, we reverse the judgment entered in this case and remand the case to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
SEE, J., concurs specially.
JOHNSTONE, J., concurs in the rationale in part but dissents from the judgment.
SEE, Justice (concurring specially).
I concur in the majority's holding that the jury charge given in this case was sufficiently confusing to constitute reversible error.
We state in this opinion:
"The presence of the retained object is prima facie evidence of negligence by the surgeon.... The presence of the retained object does not, however, establish negligence per se. Rather, it serves to shift the burden to the defendant surgeon to show that he or she was not negligent because he or she fully complied with the statutorily defined standard of care."
888 So.2d at 1217. After a defendant surgeon establishes the standard of care by expert testimony, the surgeon may present evidence showing that he or she complied with all aspects of that standard. If the surgeon does so, the main opinion suggests, "a jury question is presented as to whether the surgeon was in fact negligent." 888 So.2d at 1217.
If "[t]he presence of the retained object does not, however, establish negligence per se," that is, if something more than the presence of a retained object is required to establish negligence,[5] then the plaintiff must present substantial evidence indicating that the surgeon did not fully comply with all aspects of the standard of care or there would be no question of fact for the *1224 jury to consider. To allow otherwise would, in effect, be to declare retention of a retained object to be negligence per se, that is, that no further evidence is required.
JOHNSTONE, Justice (concurring in the rationale in part but dissenting from the judgment).
I concur in the main opinion in its explanation and reconciliation of Powell v. Mullins, 479 So.2d 1119 (Ala.1985), Ravi v. Williams, 536 So.2d 1374 (Ala.1988), Northeast Alabama Regional Medical Center v. Robinson, 548 So.2d 439 (Ala.1989), and Ravi v. Coates, 662 So.2d 218 (Ala.1995). I further concur in the holdings of the main opinion to the effect that the evidence in this case presents issues of fact to be decided by the fact-finder  the jury in this case.
I respectfully dissent, however, from the conclusion that the jury charge "was sufficiently confusing as to deprive the jury of [the] opportunity" "to consider and believe either side's evidence." I therefore respectfully dissent from the judgment of reversal.
NOTES
[1] The record does not contain Dr. Harris's full name.
[2] Dr. Breaux explained at trial that in a heavy person, the abdomen is very deep and contains up to 26 feet of "bunched up" small bowel, as compared to approximately 20 feet in a normal patient.
[3] This Court recently reaffirmed and reformulated the exception in Ex parte HealthSouth Corp., 851 So.2d 33 (Ala.2002).
[4] Justices Jones, Shores, Adams, and Steagall.
[5] "`The doctrine of negligence per se or negligence as a matter of law is based upon the principle that when an act is forbidden, or required, by an express provision of law, the legislature has adopted an absolute required standard of care which replaces the common-law standard of the reasonably prudent man. Anyone who violates that law, with resultant injury to one of those the law was intended to protect, is liable regardless of the circumstances. Proof of violation is proof of negligence.'" Thomas Learning Ctr., Inc. v. McGuirk, 766 So.2d 161, 171 (Ala.Civ.App.1998) (quoting Allen Trucking Co. v. Blakely Peanut Co., 340 So.2d 452, 453 (Ala.Civ.App.1976)).